THORNBURGH, GOVERNOR OF PENNSYLVANIA, ET
AL. *v.* AMERICAN COLLEGE OF OBSTETRICIANS
AND GYNECOLOGISTS ET AL.

No. 84–495.   Argued November 5, 1985—Decided June 11, 1986

748

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, POWELL, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 772. BURGER, C. J., filed a dissenting opinion, *post*, p. 782. WHITE, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 785. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 814.

*Andrew S. Gordon,* Senior Deputy Attorney General of Pennsylvania, argued the cause for appellants. With him on the briefs were *LeRoy S. Zimmerman,* Attorney General, and *Allen C. Warshaw,* Chief Deputy Attorney General.

*Kathryn Kolbert* argued the cause for appellees. With her on the brief was *Thomas E. Zemaitis.**

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Acting Solicitor General Fried, Acting Assistant Attorney General Willard, Deputy Assistant Attorney General Kuhl, John F. Cordes,* and *John M. Rogers;* for the National Right to Life Committee, Inc., by *James Bopp, Jr.;* for the United States Catholic Conference by *Wilfred R. Caron* and *Mark E. Chopko;* for Senator Gordon J. Humphrey et al. by *Robert A. Destro* and *Basile J. Uddo;* for Watson D. Bowes, Jr., et al. by *Steven Frederick McDowell;* and for John D. Lane et al. by *John E. McKeever.*

Briefs of *amici curiae* urging affirmance were filed for the Attorney General of New York by *Robert Abrams,* Attorney General, *pro se, Robert Hermann,* Solicitor General, *Rosemarie Rhodes,* Assistant Attorney General, and *Lawrence S. Kahn, Sanford M. Cohen,* and *Martha J. Olson,* Assistant Attorneys General; for the American Civil Liberties Union et al. by *Nan D. Hunter, Janet Benshoof,* and *Suzanne M. Lynn;* for the American

JUSTICE BLACKMUN delivered the opinion of the Court.

This is an appeal from a judgment of the United States Court of Appeals for the Third Circuit reviewing the District Court's rulings upon a motion for a preliminary injunction. The Court of Appeals held unconstitutional several provisions of Pennsylvania's current Abortion Control Act, 1982 Pa. Laws, Act No. 138, now codified as 18 Pa. Cons. Stat. § 3201 *et seq.* (1982).[1]  Among the provisions ruled invalid by the Court of Appeals were portions of § 3205, relating to "informed consent"; § 3208, concerning "printed information"; §§ 3210(b) and (c), having to do with postviability abortions; and § 3211(a) and §§ 3214(a) and (h), regarding reporting requirements.[2]

---

Medical Association et al. by *Benjamin W. Heineman, Jr., Carter G. Phillips, Newton N. Minow, Jack R. Bierig, Stephan E. Lawton, Joel I. Klein, Joseph A. Keyes, Jr.,* and *Ann E. Allen;* for the Center for Constitutional Rights et al. by *Anne E. Simon, Nadine Taub, Rhonda Copelon,* and *Judith Levin;* for the National Abortion Federation by *David I. Shapiro, Sidney Dickstein, Kenneth M. Simon,* and *Amy G. Applegate;* for the National Abortion Rights Action League et al. by *Lynn I. Miller;* for the National Family Planning and Reproductive Health Association, Inc., by *Robert T. Crothers;* for the National Organization for Women et al. by *Diane E. Thompson;* and for the Planned Parenthood Federation of America, Inc., et al. by *Dara Klassel* and *Eve W. Paul.*

Briefs of *amici curiae* were filed for the American Psychological Association by *Donald N. Bersoff* and *Bruce J. Ennis;* for the Women's Lawyers' Association of Los Angeles, California, et al. by *Susan R. Schwartz, Carol Boyk, Judith Gordon,* and *Lorraine Loder;* for the Unitarian Universalist Association et al. by *Madeline Kochen;* for Senator Bob Packwood et al. by *Laurence H. Tribe* and *Kathleen M. Sullivan;* for Susan Bandes et al. by *Arthur Kinoy;* and for Olivia Gans et al. by *James Bopp, Jr.*

[1] The District Court had held invalid and had enjoined preliminarily only the requirement of § 3205(a)(2) that at least 24 hours must elapse between a woman's receipt of specified information and the performance of her abortion.  552 F. Supp. 791, 797–798, 811 (ED Pa. 1982).

[2] The Court of Appeals also held § 3215(e) invalid.  That section requires health-care insurers to make available, at a lesser premium, policies expressly excluding coverage "for abortion services not necessary to avert

## I

The Abortion Control Act was approved by the Governor of the Commonwealth on June 11, 1982. By its own terms, however, see § 7 of the Act, it was to become effective only 180 days thereafter, that is, on the following December 8. It had been offered as an amendment to a pending bill to regulate paramilitary training.

The 1982 Act was not the Commonwealth's first attempt, after this Court's 1973 decisions in *Roe* v. *Wade*, 410 U. S. 113, and *Doe* v. *Bolton*, 410 U. S. 179, to impose abortion restraints. The State's first post-1973 Abortion Control Act, 1974 Pa. Laws, Act No. 209, was passed in 1974 over the Governor's veto. After extensive litigation, various provisions of the 1974 statute were ruled unconstitutional, including those relating to spousal or parental consent, to the choice of procedure for a postviability abortion, and to the proscription of abortion advertisements. See *Planned Parenthood Assn.* v. *Fitzpatrick*, 401 F. Supp. 554 (ED Pa. 1975), summarily aff'd in part *sub nom. Franklin* v. *Fitzgerald*, 428 U. S. 901 (1976), and summarily vacated in part and remanded *sub nom. Beal* v. *Franklin*, 428 U. S. 901 (1976), modified on remand (No. 74–2440) (ED Pa. 1977), aff'd *sub nom. Colautti* v. *Franklin*, 439 U. S. 379 (1979). See also *Doe* v. *Zimmerman*, 405 F. Supp. 534 (MD Pa. 1975).

In 1978, the Pennsylvania Legislature attempted to restrict access to abortion by limiting medical-assistance funding for the procedure. 2 1978 Pa. Laws, Act No. 16A (pp. 1506–1507) and 1 1978 Pa. Laws, Act No. 148. This effort, too, was successfully challenged in federal court, *Roe* v. *Casey*, 464 F. Supp. 487 (ED Pa. 1978), and that judgment was affirmed by the Third Circuit. 623 F. 2d 829 (1980).

In 1981, abortion legislation was proposed in the Pennsylvania House as an amendment to a pending Senate bill to out-

---

the death of the woman or to terminate pregnancies caused by rape or incest." This ruling on § 3215(e) is not before us.

law "tough-guy competitions."[3]   The suggested amendment, aimed at limiting abortions, was patterned after a model statute developed by a Chicago-based, nonprofit anti-abortion organization.   See Note, Toward Constitutional Abortion Control Legislation: The Pennsylvania Approach, 87 Dick. L. Rev. 373, 382, n. 84 (1983).   The bill underwent further change in the legislative process but, when passed, was vetoed by the Governor.   See 737 F. 2d 283, 288–289 (CA3 1984).   Finally, the 1982 Act was formulated, enacted, and approved.

After the passage of the Act, but before its effective date, the present litigation was instituted in the United States District Court for the Eastern District of Pennsylvania.   The plaintiffs, who are the appellees here, were the American College of Obstetricians and Gynecologists, Pennsylvania Section; certain physicians licensed in Pennsylvania; clergymen; an individual who purchases from a Pennsylvania insurer health-care and disability insurance extending to abortions; and Pennsylvania abortion counselors and providers. Alleging that the Act violated the United States Constitution, the plaintiffs, pursuant to 42 U. S. C. § 1983, sought declaratory and injunctive relief.   The defendants named in the complaint were the Governor of the Commonwealth, other Commonwealth officials, and the District Attorney for Montgomery County, Pa.

The plaintiffs promptly filed a motion for a preliminary injunction.   Forty-one affidavits accompanied the motion. The defendants, on their part, submitted what the Court of Appeals described as "an equally comprehensive opposing memorandum."   737 F. 2d, at 289.   The District Court then ordered the parties to submit a "stipulation of uncontested facts," as authorized by local rule.   The parties produced a stipulation "solely for purposes of a determination on plain-

---

[3] A "tough-guy competition" is a physical contact bout between persons who lack professional experience and who attempt to render each other unconscious.   See Note, 87 Dick. L. Rev. 373, 382, n. 84 (1983).

tiffs' motion for preliminary injunction," and "without prejudice to any party's right to controvert any facts or to prove any additional facts at any later proceeding in this action." App. 9a–10a.

Relying substantially on the opinions of the respective Courts of Appeals in *Akron Center for Reproductive Health, Inc.* v. *City of Akron,* 651 F. 2d 1198 (CA6 1981), later aff'd in part and rev'd in part, 462 U. S. 416 (1983), and in *Planned Parenthood Assn. of Kansas City* v. *Ashcroft,* 655 F. 2d 848 (CA8 1981), later aff'd in part and rev'd in part, 462 U. S. 476 (1983), the District Court concluded that, with one exception, see n. 1, *supra,* the plaintiffs had failed to establish a likelihood of success on the merits and thus were not entitled to preliminary injunctive relief. 552 F. Supp. 791 (1982).

Appellees appealed from the denial of the preliminary injunction, and appellants cross-appealed with respect to the single statutory provision as to which the District Court had allowed relief. The Third Circuit then granted appellees' motion to enjoin enforcement of the entire Act pending appeal. After expedited briefing and argument, the court withheld judgment pending the anticipated decisions by this Court in *Akron, supra, Ashcroft, supra,* and *Simopoulos* v. *Commonwealth,* 221 Va. 1059, 277 S. E. 2d 194 (1981), all of which had been accepted for review here, had been argued, and were under submission. Those three cases were decided by this Court on June 15, 1983. See *Akron* v. *Akron Center for Reproductive Health, Inc.,* 462 U. S. 416; *Planned Parenthood Assn. of Kansas City, Missouri, Inc.* v. *Ashcroft,* 462 U. S. 476; *Simopoulos* v. *Virginia,* 462 U. S. 506. After reargument in light of those decisions, the Court of Appeals, with one judge concurring in part and dissenting in part, ruled that various provisions of the Act were unconstitutional. 737 F. 2d 283 (1984). Appellants' petition for rehearing en banc was denied, with four judges voting to grant the petition. *Id.,* at 316, 317. When a jurisdictional state-

ment was filed here, we postponed further consideration of the question of our jurisdiction to the hearing on the merits. 471 U. S. 1014 (1985).

## II

We are confronted initially with the question whether we have appellate jurisdiction in this case. Appellants purport to have taken their appeal to this Court pursuant to 28 U. S. C. § 1254(2).[4] It seems clear, and the parties appear to agree, see Brief for Appellants 21, that the judgment of the Court of Appeals was not a final judgment in the ordinary meaning of that term. The court did not hold the entire Act unconstitutional, but ruled, instead, that some provisions were invalid under *Akron*, *Ashcroft*, and *Simopoulos*, and that the validity of other provisions might depend on evidence adduced at the trial, see 737 F. 2d, at 299–300, or on procedural rules to be promulgated by the Supreme Court of Pennsylvania, see *id.*, at 296–297. It remanded these features of the case to the District Court. *Id.*, at 304.

*Slaker* v. *O'Connor*, 278 U. S. 188, 189–190 (1929), and *McLish* v. *Roff*, 141 U. S. 661, 665–666 (1891), surely suggest that, under these circumstances, we do not have appellate jurisdiction.[5] See also *South Carolina Electric & Gas Co.* v. *Flemming*, 351 U. S. 901 (1956). Although the authority of *Slaker* and *South Carolina Electric* has been questioned, the Court to date has found it unnecessary to put the issue to rest. See *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 927 (1975); *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 43–44, n. 1 (1986). In some cases raising this issue of the

---

[4] Section 1254 reads in pertinent part:

"Cases in the courts of appeals may be reviewed by the Supreme Court by the following methods:

. . . . .

"(2) By appeal by a party relying on a State statute held by a court of appeals to be invalid as repugnant to the Constitution, treaties or laws of the United States . . . ."

[5] Appellants ask that *Slaker* be overruled. See Brief for Appellants 10, 22–25.

scope of appellate jurisdiction, the Court has found any finality requirement to have been satisfied in light of the facts. See, *e. g., New Orleans* v. *Dukes,* 427 U. S. 297, 302 (1976); *Chicago* v. *Atchison, T. & S. F. R. Co.,* 357 U. S. 77, 82–83 (1958). In other cases, the Court has avoided the issue by utilizing 28 U. S. C. § 2103 and granting certiorari. See, *e. g., Doran,* 422 U. S., at 927; *El Paso* v. *Simmons,* 379 U. S. 497, 503 (1965); see also *Escambia County* v. *McMillan,* 466 U. S. 48, 50, n. 4 (1984).

We have concluded that it is time that this undecided issue be resolved. We therefore hold, on the reasoning of *McLish* v. *Roff,* 141 U. S., at 665–668, that in a situation such as this one, where the judgment is not final, and where the case is remanded for further development of the facts, we have no appellate jurisdiction under § 1254(2).

We nevertheless treat appellants' jurisdictional statement as a petition for certiorari, grant the writ, and move on to the merits.[6]

## III

Appellants assert that the Court of Appeals erred in holding portions of the Act unconstitutional since the scope of its review of the District Court's denial of a preliminary injunction as to those sections should have been limited to determining whether the trial court abused its discretion in finding the presence or absence of irreparable harm and a probability that the plaintiffs would succeed on the merits. Such limited review normally is appropriate, see *Doran* v. *Salem Inn, Inc.,* 422 U. S., at 931–932; *Brown* v. *Chote,* 411 U. S. 452, 456–457 (1973), inasmuch as the primary purpose of a preliminary injunction is to preserve the relative positions of the parties. See *University of Texas* v. *Camenisch,* 451 U. S. 390, 395 (1981). Further, the necessity for an expeditious resolution often means that the injunction is issued on a pro-

---

[6] We continue, however, to refer to the parties as appellants and appellees, respectively.

cedure less stringent than that which prevails at the subsequent trial on the merits of the application for injunctive relief. See *United States Steel Corp.* v. *Fraternal Assn. of Steelhaulers*, 431 F. 2d 1046, 1048 (CA3 1970); see also *Mayo* v. *Lakeland Highlands Canning Co.*, 309 U. S. 310, 316 (1940).

This approach, however, is not inflexible. The Court on more than one occasion in this area has approved proceedings deviating from the stated norm. In *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579 (1952), the District Court had issued a preliminary injunction restraining the Secretary of Commerce from seizing the Nation's steel mills. The Court of Appeals stayed the injunction. This Court found that the case was ripe for review, despite the early stage of the litigation, and went on to address the merits. *Id.*, at 585. And in *Smith* v. *Vulcan Iron Works*, 165 U. S. 518 (1897), the District Court issued injunctions in two patent cases and referred them to a Master for accounting. The Court of Appeals reversed. This Court ruled that the Court of Appeals had acted properly in deciding the merits since review of interlocutory appeals was designed not only to permit the defendant to obtain immediate relief but also in certain cases to save the parties the expense of further litigation. *Id.*, at 525.

The Third Circuit's decision to address the constitutionality of the Pennsylvania Act finds further support in this Court's decisions that when the unconstitutionality of the particular state action under challenge is clear, a federal court need not abstain from addressing the constitutional issue pending state-court review. See, *e. g.*, *Bailey* v. *Patterson*, 369 U. S. 31, 33 (1962); *Turner* v. *City of Memphis*, 369 U. S. 350, 353 (1962); *Zwickler* v. *Koota*, 389 U. S. 241, 251, n. 14 (1967). See also *Singleton* v. *Wulff*, 428 U. S. 106, 121 (1976). See generally Spann, Simple Justice, 73 Geo. L. J. 1041, 1055, n. 77 (1985).[7]

---

[7] This principle finds an analogy in an established doctrine of administrative law. In *SEC* v. *Chenery Corp.*, 318 U. S. 80 (1943), the Court

Thus, as these cases indicate, if a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, that ruling may be reviewed even though the appeal is from the entry of a preliminary injunction.[8] The Court of Appeals in this case properly recognized and applied these principles when it observed:

> "Thus, although this appeal arises from a ruling on a request for a preliminary injunction, we have before us an unusually complete factual and legal presentation from which to address the important constitutional issues at stake. The customary discretion accorded to a District Court's ruling on a preliminary injunction yields to our plenary scope of review as to the applicable law." 737 F. 2d, at 290.

That a court of appeals ordinarily will limit its review in a case of this kind to abuse of discretion is a rule of orderly judicial administration, not a limit on judicial power. With a full record before it on the issues now before us, and with the intervening decisions in *Akron*, *Ashcroft*, and *Simopoulos* at hand, the Court of Appeals was justified in proceeding to plenary review of those issues.

---

ruled that a reviewing court could not affirm an agency on a principle the agency might not embrace. But the ruling in *Chenery* has not required courts to remand in futility. See *Illinois* v. *ICC*, 722 F. 2d 1341, 1348–1349 (CA7 1983); see also Friendly, *Chenery* Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 Duke L. J. 199.

[8] A different situation is presented, of course, when there is no disagreement as to the law, but the probability of success on the merits depends on facts that are likely to emerge at trial. See *Delaware & Hudson R. Co.* v. *United Transportation Union*, 146 U. S. App. D. C. 142, 159, 450 F. 2d 603, 620, cert. denied, 403 U. S. 911 (1971). See also *Airco, Inc.* v. *Energy Research & Development Admin.*, 528 F. 2d 1294, 1296 (CA7 1975); *California ex rel. Younger* v. *Tahoe Regional Planning Agency*, 516 F. 2d 215, 217 (CA9), cert. denied, 423 U. S. 868 (1975); *Natural Resources Defense Council, Inc.* v. *Morton*, 148 U. S. App. D. C. 5, 10, 458 F. 2d 827, 832 (1972); *Benda* v. *Grand Lodge*, 584 F. 2d 308, 314 (CA9 1978), cert. dism'd, 441 U. S. 937 (1979); *FTC* v. *Southwest Sunsites, Inc.*, 665 F. 2d 711, 717 (CA5), cert. denied, 456 U. S. 973 (1982).

## IV

This case, as it comes to us, concerns the constitutionality of six provisions of the Pennsylvania Act that the Court of Appeals struck down as facially invalid: § 3205 ("informed consent"); § 3208 ("printed information"); §§ 3214(a) and (h) (reporting requirements); § 3211(a) (determination of viability); § 3210(b) (degree of care required in postviability abortions); and § 3210(c) (second-physician requirement). We have no reason to address the validity of the other sections of the Act challenged in the District Court.[9]

---

[9] *Not* before us are: § 3203 (definition of "abortion"); § 3205 (24-hour waiting period and physician-only counseling); §§ 3207(b) and 3214(f) (public disclosure of reports); § 3209 (requirement of hospitalization for an abortion subsequent to the first trimester); § 3210(a) (penalties for abortion after viability, and the "complete defense" thereto); § 3215(c) (proscription of use of public funds for abortion services); and § 3215(e) (compulsory availability of insurance excluding certain abortion services).

Remanded for record development or otherwise not invalidated, and therefore not before us, are: § 3206 (parental consent — operation of statute enjoined until promulgation of rules by the Supreme Court of Pennsylvania assuring confidentiality and promptness of disposition); § 3207(b) (abortion facilities and reports from them for public disclosure); and §§ 3214(c), (d), (f), and (g) (other reporting requirements — challenges either not made or withdrawn).

On June 17, 1985, the District Court, after hearing, preliminarily enjoined the enforcement of §§ 3207(b) and 3214(f). 613 F. Supp. 656 (ED Pa.). See n. 12, *infra.*

The Supreme Court of Pennsylvania issued the suggested rules, mentioned above, on November 26, 1984, after the appeal in this case was docketed here. See Pennsylvania Orphans' Court Rules 16.1 to 16.8, reprinted in Pa. Stat. Ann., Tit. 20, pp. 65, 66 (Purdon Supp. to §§ 101–2507, 1986–1987). Appellants thereupon filed a motion with the District Court that the injunction against enforcement of § 3206 be vacated. App. 53a. That court, however, denied the motion, concluding that it had no jurisdiction "to issue the order [appellants] seek" while the case was on appeal here. *Id.,* at 57a, 61a. We decline appellants' suggestion that we now examine this feature of the case in the light of the new rules, for we conclude that this development should be considered by the District Court in the first instance.

## A

Less than three years ago, this Court, in *Akron, Ashcroft,* and *Simopoulos,* reviewed challenges to state and municipal legislation regulating the performance of abortions. In *Akron,* the Court specifically reaffirmed *Roe* v. *Wade,* 410 U. S. 113 (1973). See 462 U. S., at 420, 426–431. Again today, we reaffirm the general principles laid down in *Roe* and in *Akron.*

In the years since this Court's decision in *Roe,* States and municipalities have adopted a number of measures seemingly designed to prevent a woman, with the advice of her physician, from exercising her freedom of choice. *Akron* is but one example. But the constitutional principles that led this Court to its decisions in 1973 still provide the compelling reason for recognizing the constitutional dimensions of a woman's right to decide whether to end her pregnancy. "[I]t should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." *Brown* v. *Board of Education,* 349 U. S. 294, 300 (1955). The States are not free, under the guise of protecting maternal health or potential life, to intimidate women into continuing pregnancies. Appellants claim that the statutory provisions before us today further legitimate compelling interests of the Commonwealth. Close analysis of those provisions, however, shows that they wholly subordinate constitutional privacy interests and concerns with maternal health in an effort to deter a woman from making a decision that, with her physician, is hers to make.

## B

We turn to the challenged statutes:

1. Section 3205 ("informed consent") and § 3208 ("printed information"). Section 3205(a) requires that the woman give her "voluntary and informed consent" to an abortion. Failure to observe the provisions of § 3205 subjects the physician to suspension or revocation of his license, and subjects any

other person obligated to provide information relating to informed consent to criminal penalties. § 3205(c). A requirement that the woman give what is truly a voluntary and informed consent, as a general proposition, is, of course, proper and is surely not unconstitutional. See *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52, 67 (1976). But the State may not require the delivery of information designed "to influence the woman's informed choice between abortion or childbirth." *Akron*, 462 U. S., at 443–444.

Appellants refer to the Akron ordinance, Brief for Appellants 67, as did this Court in *Akron* itself, 462 U. S., at 445, as "a litany of information" and as "'a parade of horribles'" of dubious validity plainly designed to influence the woman's choice. They would distinguish the Akron situation, however, from the Pennsylvania one. Appellants assert that statutes "describing the general subject matter relevant to informed consent," *ibid.*, and stating "in general terms the information to be disclosed," *id.*, at 447, are permissible, and they further assert that the Pennsylvania statutes do no more than that.

We do not agree. We conclude that, like Akron's ordinance, §§ 3205 and 3208 fail the *Akron* measurement. The two sections prescribe in detail the method for securing "informed consent." Seven explicit kinds of information must be delivered to the woman at least 24 hours before her consent is given, and five of these must be presented by the woman's physician. The five are: (a) the name of the physician who will perform the abortion, (b) the "fact that there may be detrimental physical and psychological effects which are not accurately foreseeable," (c) the "particular medical risks associated with the particular abortion procedure to be employed," (d) the probable gestational age, and (e) the "medical risks associated with carrying her child to term." The remaining two categories are (f) the "fact that medical assistance benefits may be available for prenatal care, child-

birth and neonatal care," and (g) the "fact that the father is liable to assist" in the child's support, "even in instances where the father has offered to pay for the abortion." §§ 3205(a)(1) and (2). The woman also must be informed that materials printed and supplied by the Commonwealth that describe the fetus and that list agencies offering alternatives to abortion are available for her review. If she chooses to review the materials but is unable to read, the materials "shall be read to her," and any answer she seeks must be "provided her in her own language." § 3205(a)(2)(iii). She must certify in writing, prior to the abortion, that all this has been done. § 3205(a)(3). The printed materials "shall include the following statement":

> "'There are many public and private agencies willing and able to help you to carry your child to term, and to assist you and your child after your child is born, whether you choose to keep your child or place her or him for adoption. The Commonwealth of Pennsylvania strongly urges you to contact them before making a final decision about abortion. The law requires that your physician or his agent give you the opportunity to call agencies like these before you undergo an abortion.'" § 3208(a)(1).

The materials must describe the "probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from fertilization to full term, including any relevant information on the possibility of the unborn child's survival." § 3208(a)(2).

In *Akron*, this Court noted: "The validity of an informed consent requirement thus rests on the State's interest in protecting the health of the pregnant woman." 462 U. S., at 443. The Court went on to state:

> "This does not mean, however, that a State has unreviewable authority to decide what information a woman must be given before she chooses to have an

abortion. It remains primarily the responsibility of the physician to ensure that appropriate information is conveyed to his patient, depending on her particular circumstances. *Danforth*'s recognition of the State's interest in ensuring that this information be given will not justify abortion regulations designed to influence the woman's informed choice between abortion or childbirth." *Id.*, at 443–444.

The informational requirements in the *Akron* ordinance were invalid for two "equally decisive" reasons. *Id.*, at 445. The first was that "much of the information required is designed not to inform the woman's consent but rather to persuade her to withhold it altogether." *Id.*, at 444. The second was that a rigid requirement that a specific body of information be given in all cases, irrespective of the particular needs of the patient, intrudes upon the discretion of the pregnant woman's physician and thereby imposes the "undesired and uncomfortable straitjacket" with which the Court in *Danforth*, 428 U. S., at 67, n. 8, was concerned.

These two reasons apply with equal and controlling force to the specific and intrusive informational prescriptions of the Pennsylvania statutes. The printed materials required by §§ 3205 and 3208 seem to us to be nothing less than an outright attempt to wedge the Commonwealth's message discouraging abortion into the privacy of the informed-consent dialogue between the woman and her physician. The mandated description of fetal characteristics at 2-week intervals, no matter how objective, is plainly overinclusive. This is not medical information that is always relevant to the woman's decision, and it may serve only to confuse and punish her and to heighten her anxiety, contrary to accepted medical practice.[10] Even the listing of agencies in the printed Pennsylva-

---

[10] Following this Court's lead in *Akron*, federal courts consistently have stricken fetal-description requirements because of their inflammatory impact. See, *e. g., Planned Parenthood League of Massachusetts* v. *Bellotti*, 641 F. 2d 1006, 1021–1022 (CA1 1981); *Charles* v. *Carey*, 627 F. 2d

nia form presents serious problems; it contains names of agencies that well may be out of step with the needs of the particular woman and thus places the physician in an awkward position and infringes upon his or her professional responsibilities. Forcing the physician or counselor to present the materials and the list to the woman makes him or her in effect an agent of the State in treating the woman and places his or her imprimatur upon both the materials and the list. See *Women's Medical Center of Providence, Inc.* v. *Roberts,* 530 F. Supp. 1136, 1154 (RI 1982). All this is, or comes close to being, state medicine imposed upon the woman, not the professional medical guidance she seeks, and it officially structures—as it obviously was intended to do— the dialogue between the woman and her physician.

The requirements of §§ 3205(a)(2)(i) and (ii) that the woman be advised that medical assistance benefits may be available, and that the father is responsible for financial assistance in the support of the child similarly are poorly disguised elements of discouragement for the abortion decision. Much of this would be nonmedical information beyond the physician's area of expertise and, for many patients, would be irrelevant and inappropriate. For a patient with a life-threatening pregnancy, the "information" in its very rendition may be cruel as well as destructive of the physician-patient relationship. As any experienced social worker or other counselor knows, theoretical financial responsibility often does not equate with fulfillment. And a victim of rape should not have to hear gratuitous advice that an unidentified perpetrator is liable for support if she continues the pregnancy to term. Under the guise of informed consent, the Act requires the dissemination of information that is not relevant to such consent, and, thus, it advances no legitimate state interest.

772, 784 (CA7 1980); *Planned Parenthood Assn. of Kansas City* v. *Ashcroft,* 655 F. 2d 848, 868 (CA8 1981); *Women's Medical Center of Providence, Inc.* v. *Roberts,* 530 F. Supp. 1136, 1152–1154 (RI 1982).

The requirements of §§ 3205(a)(1)(ii) and (iii) that the woman be informed by the physician of "detrimental physical and psychological effects" and of all "particular medical risks" compound the problem of medical attendance, increase the patient's anxiety, and intrude upon the physician's exercise of proper professional judgment. This type of compelled information is the antithesis of informed consent. That the Commonwealth does not, and surely would not, compel similar disclosure of every possible peril of necessary surgery or of simple vaccination, reveals the anti-abortion character of the statute and its real purpose. Pennsylvania, like Akron, "has gone far beyond merely describing the general subject matter relevant to informed consent." *Akron*, 462 U. S., at 445. In addition, the Commonwealth would require the physician to recite its litany "regardless of whether in his judgment the information is relevant to [the patient's] personal decision." *Ibid.* These statutory defects cannot be saved by any facts that might be forthcoming at a subsequent hearing. Section 3205's informational requirements therefore are facially unconstitutional.[11]

Appellants assert, however, that even if this be so, the remedy is to allow the remainder of § 3205 to be severed and become effective. We rule otherwise. The radical dissection necessary for this would leave § 3205 with little resemblance to that intended by the Pennsylvania Legislature. We rejected a similar suggestion as to the ordinance in

---

[11] In their argument against this conclusion, appellants claim that the informational requirements must be held constitutional in the light of this Court's summary affirmance in *Franklin* v. *Fitzpatrick*, 428 U. S. 901 (1976), of the judgment in *Planned Parenthood Assn.* v. *Fitzpatrick*, 401 F. Supp. 554 (ED Pa. 1975). That litigation concerned the Commonwealth's 1974 Abortion Control Act. Its informed-consent provision, however, did not contain such plainly unconstitutional informational requests as those in the current Act, or any physician-only counseling or 24-hour waiting-period requirements. The summary affirmance also preceded the decision in *Akron* and, to the extent, if any at all, it might be considered to be inconsistent with *Akron*, the latter, of course, controls.

*Akron*, 462 U.S, at 445, n. 37, despite the presence there of a broad severability clause. We reach the same conclusion here, where no such clause is present, and reject the plea for severance. See *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 312–313 (1936).

2. Sections 3214(a) and (h) (reporting) and § 3211(a) (determination of viability). Section 3214(a)(8), part of the general reporting section, incorporates § 3211(a). Section 3211(a) requires the physician to report the basis for his determination "that a child is not viable." It applies only after the first trimester. The report required by §§ 3214(a) and (h) is detailed and must include, among other things, identification of the performing and referring physicians and of the facility or agency; information as to the woman's political subdivision and State of residence, age, race, marital status, and number of prior pregnancies; the date of her last menstrual period and the probable gestational age; the basis for any judgment that a medical emergency existed; the basis for any determination of nonviability; and the method of payment for the abortion. The report is to be signed by the attending physician. § 3214(b).

Despite the fact that § 3214(e)(2) provides that such reports "shall not be deemed public records," within the meaning of the Commonwealth's "Right-to-Know Law," Pa. Stat. Ann., Tit. 65, § 66.1 *et seq.* (Purdon 1959 and Supp. 1985), each report "shall be made available for public inspection and copying within 15 days of receipt in a form which will not lead to the disclosure of the identity of any person filing a report." Similarly, the report of complications, required by § 3214(h), "shall be open to public inspection and copying." A willful failure to file a report required under § 3214 is "unprofessional conduct" and the noncomplying physician's license "shall be subject to suspension or revocation." § 3214(i)(1).

The scope of the information required and its availability to the public belie any assertions by the Commonwealth that it is advancing any legitimate interest. In *Planned Parent-*

*hood of Central Missouri.* v. *Danforth,* 428 U. S., at 80, we recognized that recordkeeping and reporting provisions "that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible." But the reports required under the Act before us today go well beyond the health-related interests that served to justify the Missouri reports under consideration in *Danforth.* Pennsylvania would require, as Missouri did not, information as to method of payment, as to the woman's personal history, and as to the bases for medical judgments. The Missouri reports were to be used "only for statistical purposes." See *id.,* at 87. They were to be maintained in confidence, with the sole exception of public health officers. In *Akron,* the Court explained its holding in *Danforth* when it said: "The decisive factor was that the State met its burden of demonstrating that these regulations furthered important health-related state concerns." 462 U. S., at 430.

The required Pennsylvania reports, on the other hand, while claimed not to be "public," are available nonetheless to the public for copying. Moreover, there is no limitation on the use to which the Commonwealth or the public copiers may put them. The elements that proved persuasive for the ruling in *Danforth* are absent here. The decision to terminate a pregnancy is an intensely private one that must be protected in a way that assures anonymity. JUSTICE STEVENS, in his opinion concurring in the judgment in *Bellotti* v. *Baird,* 443 U. S. 622 (1979), aptly observed:

> "It is inherent in the right to make the abortion decision that the right may be exercised without public scrutiny and in defiance of the contrary opinion of the sovereign or other third parties." *Id.,* at 655.

A woman and her physician will necessarily be more reluctant to choose an abortion if there exists a possibility that her decision and her identity will become known publicly. Although the statute does not specifically require the reporting

of the woman's name, the amount of information about her and the circumstances under which she had an abortion are so detailed that identification is likely. Identification is the obvious purpose of these extreme reporting requirements.[12] The "impermissible limits" that *Danforth* mentioned and that Missouri approached, see 428 U. S., at 81, have been exceeded here.

We note, as we reach this conclusion, that the Court consistently has refused to allow government to chill the exercise of constitutional rights by requiring disclosure of protected, but sometimes unpopular, activities. See, *e. g.*, *Lamont* v. *Postmaster General*, 381 U. S. 301 (1965) (invalidating Post Office requirement that addressee affirmatively request delivery of "communist" materials in order to receive them); *Talley* v. *California*, 362 U. S. 60, 64–65 (1960) (striking down municipal ban on unsigned handbills); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 462–465 (1958) (invalidating compelled disclosure of NAACP membership list). Pennsylvania's reporting requirements raise the specter of public exposure and harassment of women who choose to exercise their personal, intensely private, right, with their physician, to end a pregnancy. Thus, they pose an unacceptable

---

[12] Appellees advise us, see Brief for Appellees 38–39, that they sought in the District Court a preliminary injunction against the requirement that the facility identification report and the quarterly statistical report be made available for public inspection and copying, and that on June 17, 1985, after full hearing, the District Court entered a preliminary injunction against the enforcement of these public-disclosure requirements. Appellees assert that the record of that hearing shows a continuous pattern of violence and harassment directed against the patients and staff of abortion clinics; that the District Court concluded that this would be increased by the public disclosure of facility names and quarterly statistical reports; and that public disclosure would impose a burden on the woman's right to an abortion by heightening her fear and anxiety, and by discouraging her physician from offering an abortion because, by so doing, he would avoid pressure from anti-abortion forces. That record, of course, is not now before us. We need place no reliance upon it and we draw no conclusion from it.

danger of deterring the exercise of that right, and must be invalidated.

3. Section 3210(b) (degree of care for postviability abortions) and § 3210(c) (second-physician requirement when the fetus is possibly viable). Section 3210(b)[18] sets forth two independent requirements for a postviability abortion. First, it demands the exercise of that degree of care "which such person would be required to exercise in order to preserve the life and health of any unborn child intended to be born and not aborted." Second, "the abortion technique employed shall be that which would provide the best opportunity for the unborn child to be aborted alive unless," in the physician's good-faith judgment, that technique "would present a significantly greater medical risk to the life or health of the pregnant woman." An intentional, knowing, or reckless violation of this standard is a felony of the third degree, and subjects the violator to the possibility of imprisonment for not more than seven years and to a fine of not more than $15,000. See 18 Pa. Cons. Stat. §§ 1101(2) and 1103(3) (1982).

The Court of Appeals ruled that § 3210(b) was unconstitutional because it required a "trade-off" between the woman's health and fetal survival, and failed to require that maternal

---

[18] Section 3210(b) reads:

"Every person who performs or induces an abortion after an unborn child has been determined to be viable shall exercise that degree of professional skill, care and diligence which such person would be required to exercise in order to preserve the life and health of any unborn child intended to be born and not aborted and the abortion technique employed shall be that which would provide the best opportunity for the unborn child to be aborted alive unless, in the good faith judgment of the physician, that method or technique would present a significantly greater medical risk to the life or health of the pregnant woman than would another available method or technique and the physician reports the basis for his judgment. The potential psychological or emotional impact on the mother of the unborn child's survival shall not be deemed a medical risk to the mother. Any person who intentionally, knowingly or recklessly violates the provisions of this subsection commits a felony of the third degree."

health be the physician's paramount consideration. 737 F. 2d, at 300, citing *Colautti* v. *Franklin*, 439 U. S. 379, 397–401 (1979) (where Pennsylvania's 1974 Abortion Control Act was reviewed). In *Colautti*, this Court recognized the undesirability of any " 'trade-off' between the woman's health and additional percentage points of fetal survival." *Id.*, at 400.

Appellants do not take any real issue with this proposition. See Brief for Appellants 84–86. They argue instead, as did the District Court, see 552 F. Supp., at 806–807, that the statute's words "significantly greater medical risk" for the life or health of the woman do not mean some additional risk (in which case unconstitutionality apparently is conceded) but only a "meaningfully increased" risk. That interpretation, said the District Court, renders the statute constitutional. *Id.*, at 807. The Court of Appeals disagreed, pointing out that such a reading is inconsistent with the statutory language and with the legislative intent reflected in that language; that the adverb "significantly" modifies the risk imposed on the woman; that the adverb is "patently not surplusage"; and that the language of the statute "is not susceptible to a construction that does not require the mother to bear an increased medical risk in order to save her viable fetus." 737 F. 2d, at 300. We agree with the Court of Appeals and therefore find the statute to be facially invalid.[14]

Section 3210(c) [15] requires that a second physician be present during an abortion performed when viability is possi-

---

[14] This makes it unnecessary for us to consider appellees' further argument that § 3210(b) is void for vagueness.

[15] Section 3210(c) reads:

"Any person who intends to perform an abortion the method chosen for which, in his good faith judgment, does not preclude the possibility of the child surviving the abortion, shall arrange for the attendance, in the same room in which the abortion is to be completed, of a second physician. Immediately after the complete expulsion or extraction of the child, the second physician shall take control of the child and shall provide immediate medical care for the child, taking all reasonable steps necessary, in his

ble.  The second physician is to "take control of the child and
. . . provide immediate medical care for the child, taking all
reasonable steps necessary, in his judgment, to preserve the
child's life and health."  Violation of this requirement is a
felony of the third degree.

In *Planned Parenthood Assn. of Kansas City, Missouri,
Inc.* v. *Ashcroft*, 462 U. S. 476 (1983), the Court, by a 5–4
vote, but not by a controlling single opinion, ruled that a Mis-
souri statute requiring the presence of a second physician dur-
ing an abortion performed after viability was constitutional.
JUSTICE POWELL, joined by THE CHIEF JUSTICE, concluded
that the State had a compelling interest in protecting the life
of a viable fetus and that the second physician's presence pro-
vided assurance that the State's interest was protected more
fully than with only one physician in attendance.  *Id.*, at
482–486.[16]  JUSTICE POWELL recognized that, to pass con-
stitutional muster, the statute must contain an exception for
the situation where the health of the mother was endangered
by delay in the arrival of the second physician.  Recognizing
that there was "no clearly expressed exception" on the face of
the Missouri statute for the emergency situation, JUSTICE
POWELL found the exception implicit in the statutory require-
ment that action be taken to preserve the fetus "provided it
does not pose an increased risk to the life or health of the
woman."  *Id.*, at 485, n. 8.

Like the Missouri statute, § 3210(c) of the Pennsylvania
statute contains no express exception for an emergency situa-
tion.  While the Missouri statute, in the view of JUSTICE
POWELL, was worded sufficiently to imply an emergency ex-
ception, Pennsylvania's statute contains no such comforting or

judgment, to preserve the child's life and health.  Any person who inten-
tionally, knowingly or recklessly violates the provisions of this subsection
commits a felony of the third degree."

[16] JUSTICE O'CONNOR, joined by JUSTICES WHITE and REHNQUIST,
stated somewhat categorically that the second-physician requirement was
constitutional.  462 U. S., at 505.

helpful language and evinces no intent to protect a woman whose life may be at risk. Section 3210(a)[17] provides only a defense to criminal liability for a physician who concluded, in good faith, that a fetus was nonviable "or that the abortion was necessary to preserve maternal life or health." It does not relate to the second-physician requirement and its words are not words of emergency.

It is clear that the Pennsylvania Legislature knows how to provide a medical-emergency exception when it chooses to do so. It defined "[m]edical emergency" in general terms in § 3203, and it specifically provided a medical-emergency exception with respect to informational requirements, § 3205(b); for parental consent, § 3206; for post-first-trimester hospitalization, § 3209; and for a public official's issuance of an order for an abortion without the express voluntary consent of the woman, § 3215(f). We necessarily conclude that the legislature's failure to provide a medical-emergency exception in § 3210(c) was intentional. All the factors are here for chilling the performance of a late abortion, which, more than one performed at an earlier date, perhaps tends to be under emergency conditions.

V

Constitutional rights do not always have easily ascertainable boundaries, and controversy over the meaning of our Nation's most majestic guarantees frequently has been turbulent. As judges, however, we are sworn to uphold the law even when its content gives rise to bitter dispute. See *Cooper* v. *Aaron*, 358 U. S. 1 (1958). We recognized at the very

---

[17] Section 3210(a) reads:

"Any person who intentionally, knowingly or recklessly performs or induces an abortion when the fetus is viable commits a felony of the third degree. It shall be a complete defense to any charge brought against a physician for violating the requirements of this section that he had concluded in good faith, in his best medical judgment, that the unborn child was not viable at the time the abortion was performed or induced or that the abortion was necessary to preserve maternal life or health."

beginning of our opinion in *Roe*, 410 U. S., at 116, that abortion raises moral and spiritual questions over which honorable persons can disagree sincerely and profoundly. But those disagreements did not then and do not now relieve us of our duty to apply the Constitution faithfully.

Our cases long have recognized that the Constitution embodies a promise that a certain private sphere of individual liberty will be kept largely beyond the reach of government. See, *e. g., Carey* v. *Population Services International*, 431 U. S. 678 (1977); *Moore* v. *East Cleveland*, 431 U. S. 494 (1977); *Eisenstadt* v. *Baird*, 405 U. S. 438 (1972); *Griswold* v. *Connecticut*, 381 U. S. 479 (1965); *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *Meyer* v. *Nebraska*, 262 U. S. 390 (1923). See also *Whalen* v. *Roe*, 429 U. S. 589, 598–600 (1977). That promise extends to women as well as to men. Few decisions are more personal and intimate, more properly private, or more basic to individual dignity and autonomy, than a woman's decision—with the guidance of her physician and within the limits specified in *Roe*—whether to end her pregnancy. A woman's right to make that choice freely is fundamental. Any other result, in our view, would protect inadequately a central part of the sphere of liberty that our law guarantees equally to all.

The Court of Appeals correctly invalidated the specified provisions of Pennsylvania's 1982 Abortion Control Act. Its judgment is affirmed.

*It is so ordered.*

JUSTICE STEVENS, concurring.

The scope of the individual interest in liberty that is given protection by the Due Process Clause of the Fourteenth Amendment is a matter about which conscientious judges have long disagreed. Although I believe that that interest is significantly broader than JUSTICE WHITE does,[1] I have al-

---

[1] Compare, *e. g.*, his opinion for the Court in *Meachum* v. *Fano*, 427 U. S. 215 (1976), with my dissent in that case, *id.*, at 229.

ways had the highest respect for his views on this subject.[2] In this case, although our ultimate conclusions differ, it may be useful to emphasize some of our areas of agreement in order to ensure that the clarity of certain fundamental propositions not be obscured by his forceful rhetoric.

Let me begin with a reference to *Griswold* v. *Connecticut*, 381 U. S. 479 (1965), the case holding that a State may not totally forbid the use of birth control devices. Although the Court's opinion relied on a "right of marital privacy" within the "penumbra" of the Bill of Rights, *id.*, at 481–486, JUSTICE WHITE's concurring opinion went right to the heart of the issue. He wrote:

> "It would be unduly repetitious, and belaboring the obvious, to expound on the impact of this statute on the liberty guaranteed by the Fourteenth Amendment against arbitrary or capricious denials or on the nature of this liberty. Suffice it to say that this is not the first time this Court has had occasion to articulate that the liberty entitled to protection under the Fourteenth Amendment includes the right 'to marry, establish a home and bring up children,' *Meyer* v. *Nebraska*, 262 U. S. 390, 399, and 'the liberty . . . to direct the upbringing and education of children,' *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535, and that these are among 'the basic civil rights of man.' *Skinner* v. *Oklahoma*, 316 U. S. 535, 541. These decisions affirm that there is a 'realm of family life which the state cannot enter' without substantial justification. *Prince* v. *Massachusetts*, 321 U. S. 158, 166. Surely the right invoked in this case, to be free of regulation of the intimacies of the marriage relationship, 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrange-

---

[2] See, *e. g.*, Stevens, Judicial Restraint, 22 San Diego L. Rev. 437, 449–450 (1985).

ments.' *Kovacs* v. *Cooper*, 336 U. S. 77, 95 (opinion of Frankfurter, J.)." *Id.*, at 502–503 (WHITE, J., concurring in the judgment).

He concluded that the statute could not be constitutionally applied to married persons, explaining:

"I find nothing in this record justifying the sweeping scope of this statute, with its telling effect on the freedoms of married persons, and therefore conclude that it deprives such persons of liberty without due process of law." *Id.*, at 507.

That conclusion relied in part on the fact that the statute involved "sensitive areas of liberty"[3] and in part on the absence of any colorable justification for applying the statute to married couples.

In *Eisenstadt* v. *Baird*, 405 U. S. 438 (1972), JUSTICE WHITE concluded that a similar Massachusetts statute was invalid as applied to a person whom the record did not identify as either married or unmarried, *id.*, at 464–465, and in *Carey* v. *Population Services International*, 431 U. S. 678 (1977), he subscribed to this explanation of the holdings in *Griswold* and *Eisenstadt:*

"The fatal fallacy in [the appellants'] argument is that it overlooks the underlying premise of those decisions that the Constitution protects 'the right of the individual

---

[3] "The nature of the right invaded is pertinent, to be sure, for statutes regulating sensitive areas of liberty do, under the cases of this Court, require 'strict scrutiny,' *Skinner* v. *Oklahoma*, 316 U. S. 535, 541, and 'must be viewed in the light of less drastic means for achieving the same basic purpose.' *Shelton* v. *Tucker*, 364 U. S. 479, 488. 'Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling.' *Bates* v. *Little Rock*, 361 U. S. 516, 524. See also *McLaughlin* v. *Florida*, 379 U. S. 184. But such statutes, if reasonably necessary for the effectuation of a legitimate and substantial state interest, and not arbitrary or capricious in application, are not invalid under the Due Process Clause. *Zemel* v. *Rusk*, 381 U. S. 1." 381 U. S., at 503–504.

. . . to be free from unwarranted governmental intrusion into . . . the decision whether to bear or beget a child.' [*Eisenstadt* v. *Baird*, 405 U. S.] at 453. *Griswold* did state that by 'forbidding the *use* of contraceptives rather than regulating their manufacture or sale,' the Connecticut statute there had 'a maximum destructive impact' on privacy rights. 381 U. S., at 485. This intrusion into 'the sacred precincts of marital bedrooms' made that statute particularly 'repulsive.' *Id.*, at 485–486. But subsequent decisions have made clear that the constitutional protection of individual autonomy in matters of childbearing is not dependent on that element. *Eisenstadt* v. *Baird*, holding that the protection is not limited to married couples, characterized the protected right as the *'decision* whether to bear or beget a child.' 405 U. S., at 453 (emphasis added). Similarly, *Roe* v. *Wade*, held that the Constitution protects 'a woman's *decision* whether or not to terminate her pregnancy.' 410 U. S., at 153 (emphasis added). See also *Whalen* v. *Roe*, [429 U. S. 589,] 599–600, and n. 26. These decisions put *Griswold* in proper perspective. *Griswold* may no longer be read as holding only that a State may not prohibit a married couple's use of contraceptives. Read in light of its progeny, the teaching of *Griswold* is that the Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State." 431 U. S., at 687; *id.*, at 702 (WHITE, J., concurring in pertinent part and concurring in result).

Thus, the aspect of liberty at stake in this case is the freedom from unwarranted governmental intrusion into individual decisions in matters of childbearing. As JUSTICE WHITE explained in *Griswold*, that aspect of liberty comes to this Court with a momentum for respect that is lacking when appeal is made to liberties which derive merely from shifting economic arrangements.

Like the birth control statutes involved in *Griswold* and *Baird*, the abortion statutes involved in *Roe* v. *Wade*, 410 U. S. 113 (1973), and in the case before us today apply equally to decisions made by married persons and by unmarried persons. Consistently with his views in those cases, JUSTICE WHITE agrees that "a woman's ability to choose an abortion is a species of 'liberty' that is subject to the general protections of the Due Process Clause." *Post*, at 790. His agreement with that "indisputable" proposition, *ibid.*, is not qualified or limited to decisions made by pregnant women who are married and, indeed, it would be a strange form of liberty if it were so limited.

Up to this point in JUSTICE WHITE's analysis, his opinion is fully consistent with the accepted teachings of the Court and with the major premises of *Roe* v. *Wade*. For reasons that are not entirely clear, however, JUSTICE WHITE abruptly announces that the interest in "liberty" that is implicated by a decision not to bear a child that is made a few days after conception is *less* fundamental than a comparable decision made before conception. *Post*, at 791–792. There may, of course, be a significant difference in the strength of the countervailing state interest, but I fail to see how a decision on childbearing becomes *less* important the day after conception than the day before. Indeed, if one decision is more "fundamental" to the individual's freedom than the other, surely it is the postconception decision that is the more serious. Thus, it is difficult for me to understand how JUSTICE WHITE reaches the conclusion that restraints upon this aspect of a woman's liberty do not "call into play anything more than the most minimal judicial scrutiny." *Post*, at 790.[4]

---

[4] At times JUSTICE WHITE's rhetoric conflicts with his own analysis. For instance, his emphasis on the lack of a decision by "the people . . . in 1787, 1791, 1868, or any time since," *post*, at 797, stands in sharp contrast to his earlier, forthright rejection of "the simplistic view that constitutional interpretation can possibly be limited to 'the plain meaning' of the Constitution's text or to the subjective intention of the Framers." *Post*, at 789. Similarly, his statement that an abortion decision should be sub-

If JUSTICE WHITE were correct in regarding the post-conception decision of the question whether to bear a child as a relatively unimportant, second-class sort of interest, I might agree with his view that the individual should be required to conform her decision to the will of the majority. But if that decision commands the respect that is traditionally associated with the "sensitive areas of liberty" protected by the Constitution, as JUSTICE WHITE characterized reproductive decisions in *Griswold*, 381 U. S., at 503, no individual should be compelled to surrender the freedom to make that decision for herself simply because her "value preferences" are not shared by the majority.[5]   In a sense, the basic question is whether the "abortion decision" should be made by the individual or by the majority "in the unrestrained im-

ject to "the will of the people," *post*, at 796, does not take us very far in determining *which* people—the majorities in state legislatures or the individuals confronted with unwanted pregnancies.   In view of his agreement that the decision about abortion is "a species of liberty" protected by the Constitution, moreover, *post*, at 790, and in view of the fact that "liberty" plays a rather prominent role in our Constitution, his suggestion that the Court's evaluation of that interest represents the imposition of "extraconstitutional value preferences," *post*, at 794, seems to me inexplicable.   This characterization of the Court's analysis as "extraconstitutional" also does not reflect JUSTICE WHITE's simultaneous recognition that "[t]he Constitution . . . is a document announcing fundamental principles in value-laden terms that leave ample scope for the exercise of normative judgment by those charged with interpreting and applying it."   *Post*, at 789.   Finally, I fail to see how the fact that "men and women of good will and high commitment to constitutional government," *post*, at 793, are on both sides of the abortion issue helps to resolve the difficult constitutional question before us; I take it that the disputants in most constitutional controversies in our free society can be similarly characterized.

   [5] "What a person is, what he wants, the determination of his life plan, of his concept of the good, are the most intimate expressions of self-determination, and by asserting a person's responsibility for the results of this self-determination we give substance to the concept of liberty." C. Fried, Right and Wrong, 146–147 (1978).

See also Fried, Correspondence, 6 Phil. & Pub. Aff. 288–289 (1977) (the concept of privacy embodies the "moral fact that a person belongs to himself and not others nor to society as a whole").

position of its own, extraconstitutional value preferences."
*Post*, at 794. But surely JUSTICE WHITE is quite wrong in
suggesting that the Court is imposing value preferences on
anyone else. *Ibid.*[6]

JUSTICE WHITE is also surely wrong in suggesting that
the governmental interest in protecting fetal life is equally
compelling during the entire period from the moment of con-
ception until the moment of birth. *Post*, at 795. Again, I
recognize that a powerful theological argument can be made
for that position, but I believe our jurisdiction is limited to
the evaluation of secular state interests.[7] I should think
it obvious that the State's interest in the protection of an
embryo—even if that interest is defined as "protecting those
who will be citizens," *ibid.*—increases progressively and
dramatically as the organism's capacity to feel pain, to ex-
perience pleasure, to survive, and to react to its surround-
ings increases day by day. The development of a fetus—and
pregnancy itself—are not static conditions, and the assertion
that the government's interest is static simply ignores this
reality.

---

[6] JUSTICE WHITE's characterization of the governmental interest as
"protecting those who will be citizens if their lives are not ended in the
womb," *post*, at 795, reveals that his opinion may be influenced as much by
his own value preferences as by his view about the proper allocation of de-
cisionmaking responsibilities between the individual and the State. For if
federal judges must allow the State to make the abortion decision, presum-
ably the State is free to decide that a woman may *never* abort, may *some-
times* abort, or, as in the People's Republic of China, must *always* abort if
her family is already too large. In contrast, our cases represent a consist-
ent view that the individual is primarily responsible for reproductive deci-
sions, whether the State seeks to prohibit reproduction, *Skinner* v. *Okla-
homa*, 316 U. S. 535 (1942), or to require it, *Roe* v. *Wade*, 410 U. S. 113
(1973).

[7] The responsibility for nurturing the soul of the newly born, as well as
the unborn, rests with individual parents, not with the State. No matter
how important a sacrament such as baptism may be, a State surely could
not punish a mother for refusing to baptize her child.

Nor is it an answer to argue that life itself is not a static condition, and that "there is no nonarbitrary line separating a fetus from a child, or indeed, an adult human being," *post*, at 792. For, unless the religious view that a fetus is a "person" is adopted—a view JUSTICE WHITE refuses to embrace, *ibid.*—there is a fundamental and well-recognized difference between a fetus and a human being; indeed, if there is not such a difference, the permissibility of terminating the life of a fetus could scarcely be left to the will of the state legislatures.[8] And if distinctions may be drawn between a fetus and a human being in terms of the state interest in their protection—even though the fetus represents one of "those who will be citizens"—it seems to me quite odd to argue that distinctions may not also be drawn between the state interest in protecting the freshly fertilized egg and the state interest in protecting the 9-month-gestated, fully sentient fetus on the eve of birth. Recognition of this distinction is supported not only by logic, but also by history[9] and by our shared experiences.

Turning to JUSTICE WHITE's comments on *stare decisis*, he is of course correct in pointing out that the Court "has not hesitated to overrule decisions, or even whole lines of cases, where experience, scholarship, and reflection demonstrated that their fundamental premises were not to be found in the Constitution." *Post*, at 787. But JUSTICE WHITE has not disavowed the "fundamental premises" on which the decision in *Roe* v. *Wade* rests. He has not disavowed the Court's prior approach to the interpretation of the word "liberty" or, more narrowly, the line of cases that culminated in the unequivocal holding, applied to unmarried persons and married persons alike, "that the Constitution protects individual decisions in matters of childbearing from unjustified intrusion by

[8] No Member of this Court has ever suggested that a fetus is a "person" within the meaning of the Fourteenth Amendment.

[9] See *Roe* v. *Wade, supra,* at 129–147.

the State." *Carey*, 431 U. S., at 687; *id.*, at 702 (WHITE, J., concurring in pertinent part).[10]

Nor does the fact that the doctrine of *stare decisis* is not an absolute bar to the reexamination of past interpretations of the Constitution mean that the values underlying that doctrine may be summarily put to one side. There is a strong public interest in stability, and in the orderly conduct of our

[10] He has, however, suggested that the concept of "liberty" is limited by two basic "definitions" of the values at stake. *Post*, at 790–791. Like JUSTICE WHITE, I share Justice Harlan's concern about "judges . . . roaming at large in the constitutional field." *Ibid.;* see also Stevens, 22 San Diego L. Rev., at 449–450. But I am convinced that JUSTICE WHITE's use of "definitions" is an inadequate substitute for the difficult process of analysis and judgment that the guarantee of liberty requires, a process nowhere better expressed than by Justice Harlan:

"Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint.

.          .          .          .          .

"Each new claim to Constitutional protection must be considered against a background of Constitutional purposes, as they have been rationally perceived and historically developed. Though we exercise limited and sharply restrained judgment, yet there is no 'mechanical yardstick,' no 'mechanical answer.' The decision of an apparently novel claim must depend on grounds which follow closely on well-accepted principles and criteria. The new decision must take 'its place in relation to what went before and further [cut] a channel for what is to come.' *Irvine* v. *California*, 347 U. S. 128, 147 (dissenting opinion)." *Poe* v. *Ullman*, 367 U. S. 497, 542–544 (1961) (Harlan, J., dissenting).

affairs, that is served by a consistent course of constitutional adjudication. Acceptance of the fundamental premises that underlie the decision in *Roe* v. *Wade*, as well as the application of those premises in that case, places the primary responsibility for decision in matters of childbearing squarely in the private sector of our society.[11] The majority remains free to preach the evils of birth control and abortion and to persuade others to make correct decisions while the individual faced with the reality of a difficult choice having serious and personal consequences of major importance to her own future—perhaps to the salvation of her own immortal soul— remains free to seek and to obtain sympathetic guidance from those who share her own value preferences.

In the final analysis, the holding in *Roe* v. *Wade* presumes that it is far better to permit some individuals to make incorrect decisions than to deny all individuals the right to make decisions that have a profound effect upon their destiny. Arguably a very primitive society would have been protected from evil by a rule against eating apples; a majority familiar with Adam's experience might favor such a rule. But the lawmakers who placed a special premium on the protection of

---

[11] "These cases do not deal with the individual's interest in protection from unwarranted public attention, comment, or exploitation. They deal, rather, with the individual's right to make certain unusually important decisions that will affect his own, or his family's, destiny. The Court has referred to such decisions as implicating 'basic values,' as being 'fundamental,' and as being dignified by history and tradition. The character of the Court's language in these cases brings to mind the origins of the American heritage of freedom—the abiding interest in individual liberty that makes certain state intrusions on the citizen's right to decide how he will live his own life intolerable. Guided by history, our tradition of respect for the dignity of individual choice in matters of conscience and the restraints implicit in the federal system, federal judges have accepted the responsibility for recognition and protection of these rights in appropriate cases." *Fitzgerald* v. *Porter Memorial Hospital*, 523 F. 2d 716, 719–720 (CA7 1975) (footnotes omitted), cert. denied, 425 U. S. 916 (1976).

individual liberty have recognized that certain values are more important than the will of a transient majority.[12]

CHIEF JUSTICE BURGER, dissenting.

I agree with much of JUSTICE WHITE's and JUSTICE O'CONNOR's dissents. In my concurrence in the companion case to *Roe* v. *Wade,* 410 U. S. 113, in 1973, I noted:

> "I do not read the Court's holdings today as having the sweeping consequences attributed to them by the dissenting Justices; the dissenting views discount the reality that the vast majority of physicians observe the standards of their profession, and act only on the basis of carefully deliberated medical judgments relating to life and health. Plainly, the Court today rejects any claim that the Constitution requires abortions on demand." *Doe* v. *Bolton,* 410 U. S. 179, 208 (1973).

Later, in *Maher* v. *Roe,* 432 U. S. 464, 481 (1977), I stated my view that

> "[t]he Court's holdings in *Roe* . . . and *Doe* v. *Bolton* . . . simply require that a State not create an absolute barrier to a woman's decision to have an abortion."

I based my concurring statements in *Roe* and *Maher* on the principle expressed in the Court's opinion in *Roe* that the right to an abortion "is not unqualified and must be considered against important state interests in regulation." 410 U. S., at 154–155. In short, every Member of the *Roe* Court rejected the idea of abortion on demand. The Court's opinion today, however, plainly undermines that important

---

[12] "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 638 (1943).

principle, and I regretfully conclude that some of the concerns of the dissenting Justices in *Roe*, as well as the concerns I expressed in my separate opinion, have now been realized.

The extent to which the Court has departed from the limitations expressed in *Roe* is readily apparent. In *Roe*, the Court emphasized

> "that the State does have an important and legitimate interest in preserving and protecting the health of the pregnant woman . . . ." *Id.*, at 162.

Yet today the Court astonishingly goes so far as to say that the State may not even require that a woman contemplating an abortion be provided with accurate medical information concerning the risks inherent in the medical procedure which she is about to undergo and the availability of state-funded alternatives if she elects not to run those risks. Can anyone doubt that the State could impose a similar requirement with respect to other medical procedures? Can anyone doubt that doctors routinely give similar information concerning risks in countless procedures having far less impact on life and health, both physical and emotional than an abortion, and risk a malpractice lawsuit if they fail to do so?

Yet the Court concludes that the State cannot impose this simple information-dispensing requirement in the abortion context where the decision is fraught with serious physical, psychological, and moral concerns of the highest order. Can it possibly be that the Court is saying that the Constitution *forbids* the communication of such critical information to a woman?* We have apparently already passed the point at

---

*The Court's astounding rationale for this holding is that such information might have the effect of "discouraging abortion," *ante*, at 762, as though abortion is something to be advocated and encouraged. This is at odds not only with *Roe* but with our subsequent abortion decisions as well. As I stated in my opinion for the Court in *H. L. v. Matheson*, 450 U. S. 398 (1981), upholding a Utah statute requiring that a doctor notify the parents of a minor seeking an abortion: "The Constitution does not compel a state

which abortion is available merely on demand. If the statute at issue here is to be invalidated, the "demand" will not even have to be the result of an informed choice.

The Court in *Roe* further recognized that the State "has still *another* important and legitimate interest" which is "separate and distinct" from the interest in protecting maternal health, *i. e.*, an interest in "protecting the potentiality of human life." *Ibid.* The point at which these interests become "compelling" under *Roe* is at viability of the fetus. *Id.*, at 163. Today, however, the Court abandons that standard and renders the solemnly stated concerns of the 1973 *Roe* opinion for the interests of the states mere shallow rhetoric. The statute at issue in this case requires that a second physician be present during an abortion performed after viability, so that the second physician can "take control of the child and . . . provide immediate medical care . . . taking all reasonable steps necessary, in his judgment, to preserve the child's life and health." 18 Pa. Cons. Stat. § 3210(c) (1982).

Essentially this provision simply states that a viable fetus is to be cared for, not destroyed. No governmental power exists to say that a viable fetus should not have every protection required to preserve its life. Undoubtedly the Pennsylvania Legislature added the second-physician requirement on the mistaken assumption that this Court meant what it said in *Roe* concerning the "compelling interest" of the states in potential life after viability.

The Court's opinion today is but the most recent indication of the distance traveled since *Roe*. Perhaps the first important road marker was the Court's holding in *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52 (1976), in which the Court held (over the dissent of JUSTICE WHITE

---

to fine-tune its statutes so as to encourage or faciliate abortions. To the contrary, state action 'encouraging childbirth except in the most urgent circumstances' is 'rationally related to the legitimate governmental objective of protecting potential life.'" *Id.*, at 413 (quoting *Harris* v. *McRae*, 448 U. S. 297, 325 (1980)).

joined by JUSTICE REHNQUIST and myself) that the State may not require that minors seeking an abortion first obtain parental consent. Parents, not judges or social workers, have the inherent right and responsibility to advise their children in matters of this sensitivity and consequence. Can one imagine a surgeon performing an amputation or even an appendectomy on a 14-year-old girl without the consent of a parent or guardian except in an emergency situation?

Yet today the Court goes beyond *Danforth* by remanding for further consideration of the provisions of Pennsylvania's statute requiring that a minor seeking an abortion without parental consent petition the appropriate court for authorization. Even if I were to agree that the Constitution requires that the states may not provide that a minor receive parental consent before undergoing an abortion, I would certainly hold that judicial approval may be required. This is in keeping with the longstanding common-law principle that courts may function *in loco parentis* when parents are unavailable or neglectful, even though courts are not very satisfactory substitutes when the issue is whether a 12-, 14-, or 16-year-old unmarried girl should have an abortion. In my view, no remand is necessary on this point because the statutory provision in question is constitutional.

In discovering constitutional infirmities in state regulations of abortion that are in accord with our history and tradition, we may have lured judges into "roaming at large in the constitutional field." *Griswold* v. *Connecticut*, 381 U. S. 479, 502 (1965) (Harlan, J., concurring). The soundness of our holdings must be tested by the decisions that purport to follow them. If *Danforth* and today's holding really mean what they seem to say, I agree we should reexamine *Roe*.

JUSTICE WHITE, with whom JUSTICE REHNQUIST joins, dissenting.

Today the Court carries forward the "difficult and continuing venture in substantive due process," *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52 (1976)

(WHITE, J., dissenting), that began with the decision in *Roe* v. *Wade*, 410 U. S. 113 (1973), and has led the Court further and further afield in the 13 years since that decision was handed down.   I was in dissent in *Roe* v. *Wade* and am in dissent today.   In Part I below, I state why I continue to believe that this venture has been fundamentally misguided since its inception.   In Part II, I submit that even accepting *Roe* v. *Wade*, the concerns underlying that decision by no means command or justify the results reached today.   Indeed, in my view, our precedents in this area, applied in a manner consistent with sound principles of constitutional adjudication, require reversal of the Court of Appeals on the ground that the provisions before us are facially constitutional.[1]

## I

The rule of *stare decisis* is essential if case-by-case judicial decisionmaking is to be reconciled with the principle of the

---

[1] I shall, for the most part, leave to one side the Court's somewhat extraordinary procedural rulings.   I do not strongly disagree with the Court's decision to read a finality requirement into 28 U. S. C. § 1254(2), although I would have thought it incumbent on the Court to explain why the Court of Appeals' judgment as to the statutory provisions before us today, which represents a definitive ruling on their constitutionality, is not sufficiently "final" to satisfy the jurisdictional statute as interpreted by the Court.

As for the Court's ruling that it is permissible for an appellate court to resolve an appeal from the grant or the denial of a preliminary injunction by issuing a final judgment as to the constitutionality of a statute, I do not disagree that this may, in rare cases, be an appropriate course of action where the constitutional issues are clear.   I would stress that this is by no means the preferred course of action in the run of cases, and I assume that the majority's opinion is not to the contrary.   I do disagree quite strongly with the majority's application of this principle here, as I believe, contrary to the majority, that it is quite evident that the statute before us is constitutional on its face.   I also believe, as will become evident, that at least one of the Court's rulings is exceedingly inappropriate in view of the preliminary posture of this case even if the majority's legal premises are accepted.

rule of law, for when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results. But *stare decisis* is not the only constraint upon judicial decisionmaking. Cases—like this one—that involve our assumed power to set aside on grounds of unconstitutionality a state or federal statute representing the democratically expressed will of the people call other considerations into play. Because the Constitution itself is ordained and established by the people of the United States, constitutional adjudication by this Court does not, in theory at any rate, frustrate the authority of the people to govern themselves through institutions of their own devising and in accordance with principles of their own choosing. But decisions that find in the Constitution principles or values that cannot fairly be read into that document usurp the people's authority, for such decisions represent choices that the people have never made and that they cannot disavow through corrective legislation. For this reason, it is essential that this Court maintain the power to restore authority to its proper possessors by correcting constitutional decisions that, on reconsideration, are found to be mistaken.

The Court has therefore adhered to the rule that *stare decisis* is not rigidly applied in cases involving constitutional issues, see *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 543 (1962) (opinion of Harlan, J.), and has not hesitated to overrule decisions, or even whole lines of cases, where experience, scholarship, and reflection demonstrated that their fundamental premises were not to be found in the Constitution. *Stare decisis* did not stand in the way of the Justices who, in the late 1930's, swept away constitutional doctrines that had placed unwarranted restrictions on the power of the State and Federal Governments to enact social and economic legislation, see *United States* v. *Darby*, 312 U. S. 100 (1941); *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379 (1937). Nor did *stare decisis* deter a different set of Justices, some 15 years

later, from rejecting the theretofore prevailing view that the Fourteenth Amendment permitted the States to maintain the system of racial segregation. *Brown* v. *Board of Education*, 347 U. S. 483 (1954). In both instances, history has been far kinder to those who departed from precedent than to those who would have blindly followed the rule of *stare decisis*. And only last Term, the author of today's majority opinion reminded us once again that "when it has become apparent that a prior decision has departed from a proper understanding" of the Constitution, that decision must be overruled. *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 557 (1985).

In my view, the time has come to recognize that *Roe* v. *Wade*, no less than the cases overruled by the Court in the decisions I have just cited, "departs from a proper understanding" of the Constitution and to overrule it. I do not claim that the arguments in support of this proposition are new ones or that they were not considered by the Court in *Roe* or in the cases that succeeded it. Cf. *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 419–420 (1983). But if an argument that a constitutional decision is erroneous must be novel in order to justify overruling that precedent, the Court's decisions in *Lochner* v. *New York*, 198 U. S. 45 (1905), and *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), would remain the law, for the doctrines announced in those decisions were nowhere more eloquently or incisively criticized than in the dissenting opinions of Justices Holmes (in *Lochner*) and Harlan (in both cases). That the flaws in an opinion were evident at the time it was handed down is hardly a reason for adhering to it.

A

*Roe* v. *Wade* posits that a woman has a fundamental right to terminate her pregnancy, and that this right may be restricted only in the service of two compelling state interests: the interest in maternal health (which becomes compelling

only at the stage in pregnancy at which an abortion becomes more hazardous than carrying the pregnancy to term) and the interest in protecting the life of the fetus (which becomes compelling only at the point of viability). A reader of the Constitution might be surprised to find that it encompassed these detailed rules, for the text obviously contains no references to abortion, nor, indeed, to pregnancy or reproduction generally; and, of course, it is highly doubtful that the authors of any of the provisions of the Constitution believed that they were giving protection to abortion. As its prior cases clearly show, however, this Court does not subscribe to the simplistic view that constitutional interpretation can possibly be limited to the "plain meaning" of the Constitution's text or to the subjective intention of the Framers. The Constitution is not a deed setting forth the precise metes and bounds of its subject matter; rather, it is a document announcing fundamental principles in value-laden terms that leave ample scope for the exercise of normative judgment by those charged with interpreting and applying it. In particular, the Due Process Clause of the Fourteenth Amendment, which forbids the deprivation of "life, liberty, or property without due process of law," has been read by the majority of the Court to be broad enough to provide substantive protection against state infringement of a broad range of individual interests. See *Moore* v. *East Cleveland*, 431 U. S. 494, 541–552 (1977) (WHITE, J., dissenting).

In most instances, the substantive protection afforded the liberty or property of an individual by the Fourteenth Amendment is extremely limited: State action impinging on individual interests need only be rational to survive scrutiny under the Due Process Clause, and the determination of rationality is to be made with a heavy dose of deference to the policy choices of the legislature. Only "fundamental" rights are entitled to the added protection provided by strict judicial scrutiny of legislation that impinges upon them. See *id.*, at 499 (opinion of POWELL, J.); *id.*, at 537 (Stewart, J., joined by

REHNQUIST, J., dissenting); *id.*, at 547–549 (WHITE, J., dissenting). I can certainly agree with the proposition—which I deem indisputable—that a woman's ability to choose an abortion is a species of "liberty" that is subject to the general protections of the Due Process Clause. I cannot agree, however, that this liberty is so "fundamental" that restrictions upon it call into play anything more than the most minimal judicial scrutiny.

Fundamental liberties and interests are most clearly present when the Constitution provides specific textual recognition of their existence and importance. Thus, the Court is on relatively firm ground when it deems certain of the liberties set forth in the Bill of Rights to be fundamental and therefore finds them incorporated in the Fourteenth Amendment's guarantee that no State may deprive any person of liberty without due process of law. When the Court ventures further and defines as "fundamental" liberties that are nowhere mentioned in the Constitution (or that are present only in the so-called "penumbras" of specifically enumerated rights), it must, of necessity, act with more caution, lest it open itself to the accusation that, in the name of identifying constitutional principles to which the people have consented in framing their Constitution, the Court has done nothing more than impose its own controversial choices of value upon the people.

Attempts to articulate the constraints that must operate upon the Court when it employs the Due Process Clause to protect liberties not specifically enumerated in the text of the Constitution have produced varying definitions of "fundamental liberties." One approach has been to limit the class of fundamental liberties to those interests that are "implicit in the concept of ordered liberty" such that "neither liberty nor justice would exist if [they] were sacrificed." *Palko* v. *Connecticut,* 302 U. S. 319, 325, 326 (1937); see *Moore* v. *East Cleveland,* 431 U. S., at 537 (Stewart, J., joined by REHNQUIST, J., dissenting). Another, broader approach is

to define fundamental liberties as those that are "deeply rooted in this Nation's history and tradition." *Id.*, at 503 (opinion of POWELL, J.); see also *Griswold* v. *Connecticut*, 381 U. S. 479, 501 (1965) (Harlan, J., concurring). These distillations of the possible approaches to the identification of unenumerated fundamental rights are not and do not purport to be precise legal tests or "mechanical yardstick[s]," *Poe* v. *Ullman*, 367 U. S. 497, 544 (1961) (Harlan, J., dissenting). Their utility lies in their effort to identify some source of constitutional value that reflects not the philosophical predilections of individual judges, but basic choices made by the people themselves in constituting their system of government — *"the balance struck by this country," id.*, at 542 (emphasis added) — and they seek to achieve this end through locating fundamental rights either in the traditions and consensus of our society as a whole or in the logical implications of a system that recognizes both individual liberty and democratic order. Whether either of these approaches can, as Justice Harlan hoped, prevent "judges from roaming at large in the constitutional field," *Griswold, supra,* at 502, is debatable. What for me is not subject to debate, however, is that either of the basic definitions of fundamental liberties, taken seriously, indicates the illegitimacy of the Court's decision in *Roe* v. *Wade.*

The Court has justified the recognition of a woman's fundamental right to terminate her pregnancy by invoking decisions upholding claims of personal autonomy in connection with the conduct of family life, the rearing of children, marital privacy, the use of contraceptives, and the preservation of the individual's capacity to procreate. See *Carey* v. *Population Services International*, 431 U. S. 678 (1977); *Moore* v. *East Cleveland, supra; Eisenstadt* v. *Baird*, 405 U. S. 438 (1972); *Griswold* v. *Connecticut, supra; Skinner* v. *Oklahoma*, 316 U. S. 535 (1942); *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *Meyer* v. *Nebraska*, 262 U. S. 390 (1923). Even if each of these cases was correctly decided

and could be properly grounded in rights that are "implicit in the concept of ordered liberty" or "deeply rooted in this Nation's history and tradition," the issues in the cases cited differ from those at stake where abortion is concerned. As the Court appropriately recognized in *Roe* v. *Wade*, "[t]he pregnant woman cannot be isolated in her privacy," 410 U. S., at 159; the termination of a pregnancy typically involves the destruction of another entity: the fetus. However one answers the metaphysical or theological question whether the fetus is a "human being" or the legal question whether it is a "person" as that term is used in the Constitution, one must at least recognize, first, that the fetus is an entity that bears in its cells all the genetic information that characterizes a member of the species *homo sapiens* and distinguishes an individual member of that species from all others, and second, that there is no nonarbitrary line separating a fetus from a child or, indeed, an adult human being. Given that the continued existence and development—that is to say, the *life*—of such an entity are so directly at stake in the woman's decision whether or not to terminate her pregnancy, that decision must be recognized as *sui generis*, different in kind from the others that the Court has protected under the rubric of personal or family privacy and autonomy.[2] Accordingly, the

---

[2] That the abortion decision, like the decisions protected in *Griswold*, *Eisenstadt*, and *Carey*, concerns childbearing (or, more generally, family life) in no sense necessitates a holding that the liberty to choose abortion is "fundamental." That the decision involves the destruction of the fetus renders it different in kind from the decision not to conceive in the first place. This difference does not go merely to the weight of the state interest in regulating abortion; it affects as well the characterization of the liberty interest itself. For if the liberty to make certain decisions with respect to contraception without governmental constraint is "fundamental," it is not only because those decisions are "serious" and "important" to the individual, see *ante*, at 776 (STEVENS, J., concurring), but also because some value of privacy or individual autonomy that is somehow implicit in the scheme of ordered liberties established by the Constitution supports a judgment that such decisions are none of government's business. The

decisions cited by the Court both in *Roe* and in its opinion today as precedent for the fundamental nature of the liberty to choose abortion do not, even if all are accepted as valid, dictate the Court's classification.

If the woman's liberty to choose an abortion is fundamental, then, it is not because any of our precedents (aside from *Roe* itself) command or justify that result; it can only be because protection for this unique choice is itself "implicit in the concept of ordered liberty" or, perhaps, "deeply rooted in this Nation's history and tradition." It seems clear to me that it is neither. The Court's opinion in *Roe* itself convincingly refutes the notion that the abortion liberty is deeply rooted in the history or tradition of our people, as does the continuing and deep division of the people themselves over the question of abortion. As for the notion that choice in the matter of abortion is implicit in the concept of ordered liberty, it seems apparent to me that a free, egalitarian, and democratic society does not presuppose any particular rule or set of rules with respect to abortion. And again, the fact that many men and women of good will and high commitment to constitutional government place themselves on both sides of the abortion controversy strengthens my own conviction that the values animating the Constitution do not compel rec-

---

same cannot be said where, as here, the individual is not "isolated in her privacy."

My point can be illustrated by drawing on a related area in which fundamental liberty interests have been found: childrearing. The Court's decisions in *Moore* v. *East Cleveland, Pierce* v. *Society of Sisters,* and *Meyer* v. *Nebraska* can be read for the proposition that parents have a fundamental liberty to make decisions with respect to the upbringing of their children. But no one would suggest that this fundamental liberty extends to assaults committed upon children by their parents. It is not the case that parents have a fundamental liberty to engage in such activities and that the State may intrude to prevent them only because it has a compelling interest in the well-being of children; rather, such activities, by their very nature, should be viewed as outside the scope of the fundamental liberty interest.

ognition of the abortion liberty as fundamental. In so denominating that liberty, the Court engages not in constitutional interpretation, but in the unrestrained imposition of its own, extraconstitutional value preferences.[3]

## B

A second, equally basic error infects the Court's decision in *Roe* v. *Wade*. The detailed set of rules governing state restrictions on abortion that the Court first articulated in *Roe* and has since refined and elaborated presupposes not only that the woman's liberty to choose an abortion is fundamental, but also that the State's countervailing interest in protecting fetal life (or, as the Court would have it, "potential human life," 410 U. S., at 159) becomes "compelling" only at the point at which the fetus is viable. As JUSTICE O'CONNOR pointed out three years ago in her dissent in *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S., at 461, the Court's choice of viability as the point at which the State's interest becomes compelling is entirely arbitrary. The Court's "explanation" for the line it has drawn is that the State's interest becomes compelling at viability "because the fetus then presumably has the capacity of meaningful life outside the mother's womb." 410 U. S., at 163. As one critic

---

[3] JUSTICE STEVENS asserts, *ante*, at 778, that I am "quite wrong in suggesting that the Court is imposing value preferences on anyone else" when it denominates the liberty to choose abortion as "fundamental" (in contradistinction to such other, nonfundamental liberties as the liberty to use dangerous drugs or to operate a business without governmental interference) and thereby disempowers state electoral majorities from legislating in this area. I can only respond that I cannot conceive of a definition of the phrase "imposing value preferences" that does not encompass the Court's action.

JUSTICE STEVENS also suggests that it is the legislative majority that has engaged in "the unrestrained imposition of its own, extraconstitutional value preferences" when a state legislature restricts the availability of abortion. *Ibid.* But a legislature, unlike a court, has the inherent power to do so unless its choices are constitutionally *forbidden*, which, in my view, is not the case here.

of *Roe* has observed, this argument "mistakes a definition for a syllogism." Ely, The Wages of Crying Wolf: A Comment on *Roe v. Wade*, 82 Yale L. J. 920, 924 (1973).

The governmental interest at issue is in protecting those who will be citizens if their lives are not ended in the womb. The substantiality of this interest is in no way dependent on the probability that the fetus may be capable of surviving outside the womb at any given point in its development, as the possibility of fetal survival is contingent on the state of medical practice and technology, factors that are in essence morally and constitutionally irrelevant. The State's interest is in the fetus as an entity in itself, and the character of this entity does not change at the point of viability under conventional medical wisdom. Accordingly, the State's interest, if compelling after viability, is equally compelling before viability.[4]

---

[4] Contrary to JUSTICE STEVENS' suggestion, *ibid.*, this is no more a "theological" position than is the Court's own judgment that viability is the point at which the state interest becomes compelling. (Interestingly, JUSTICE STEVENS omits any real effort to defend this judgment.) The point is that the specific interest the Court has recognized as compelling after the point of viability—that is, the interest in protecting "potential human life"—is present as well before viability, and the point of viability seems to bear no discernible relationship to the strength of that interest. Thus, there is no basis for concluding that the essential character of the state interest becomes transformed at the point of viability.

Further, it is self-evident that neither the legislative decision to assert a state interest in fetal life before viability nor the judicial decision to recognize that interest as compelling constitutes an impermissible "religious" decision merely because it coincides with the belief of one or more religions. Certainly the fact that the prohibition of murder coincides with one of the Ten Commandments does not render a State's interest in its murder statutes less than compelling, nor are legislative and judicial decisions concerning the use of the death penalty tainted by their correspondence to varying religious views on that subject. The simple, and perhaps unfortunate, fact of the matter is that in determining whether to assert an interest in fetal life, a State cannot avoid taking a position that will correspond to some religious beliefs and contradict others. The same is true to some extent with respect to the choice this Court faces in characterizing an asserted state

## C

Both the characterization of the abortion liberty as fundamental and the denigration of the State's interest in preserving the lives of nonviable fetuses are essential to the detailed set of constitutional rules devised by the Court to limit the States' power to regulate abortion. If either or both of these facets of *Roe* v. *Wade* were rejected, a broad range of limitations on abortion (including outright prohibition) that are now unavailable to the States would again become constitutional possibilities.

In my view, such a state of affairs would be highly desirable from the standpoint of the Constitution. Abortion is a hotly contested moral and political issue. Such issues, in our society, are to be resolved by the will of the people, either as expressed through legislation or through the general principles they have already incorporated into the Constitution they have adopted.[5] *Roe* v. *Wade* implies that the people

interest in fetal life, for denying that such an interest is a "compelling" one necessarily entails a negative resolution of the "religious" issue of the humanity of the fetus, whereas accepting the State's interest as compelling reflects at least tolerance for a state decision that is congruent with the equally "religious" position that human life begins at conception. Faced with such a decision, the most appropriate course of action for the Court is to defer to a legislative resolution of the issue: in other words, if a state legislature asserts an interest in protecting fetal life, I can see no satisfactory basis for *denying* that it is compelling.

[5] JUSTICE STEVENS, see *ante*, at 776–777, n. 4, finds a contradiction between my recognition that constitutional analysis requires more than mere textual analysis or a search for the specific intent of the Framers, *supra*, at 789, and my assertion that it is ultimately the will of the people that is the source of whatever values are incorporated in the Constitution. The fallacy of JUSTICE STEVENS' argument is glaring. The rejection of what has been characterized as "clause-bound" interpretivism, J. Ely, Democracy and Distrust 12 (1980), does not necessarily carry with it a rejection of the notion that constitutional adjudication is a search for values and principles that are implicit (and explicit) in the structure of rights and institutions that the people have themselves created. The implications of those values for the resolution of particular issues will in many if not most cases not have been explicitly considered when the values themselves were

have already resolved the debate by weaving into the Constitution the values and principles that answer the issue. As I have argued, I believe it is clear that the people have never—not in 1787, 1791, 1868, or at any time since—done any such thing. I would return the issue to the people by overruling *Roe* v. *Wade*.

## II

As it has evolved in the decisions of this Court, the freedom recognized by the Court in *Roe* v. *Wade* and its progeny is essentially a negative one, based not on the notion that abortion is a good in itself, but only on the view that the legitimate goals that may be served by state coercion of private choices regarding abortion are, at least under some circumstances, outweighed by the damage to individual autonomy and privacy that such coercion entails. In other words, the evil of abortion does not justify the evil of forbidding it. Cf. *Stanley* v. *Georgia*, 394 U. S. 557 (1969). But precisely because *Roe* v. *Wade* is not premised on the notion that abortion is itself desirable (either as a matter of constitutional entitlement or of social policy), the decision does not command the States to fund or encourage abortion, or even to approve

---

chosen—indeed, there will be some cases in which those who framed the provisions incorporating certain principles into the Constitution will be found to have been incorrect in their assessment of the consequences of their decision. See, *e. g., Brown* v. *Board of Education,* 347 U. S. 483 (1954).ʹ Nonetheless, the hallmark of a correct decision of constitutional law is that it rests on principles selected by the people through their Constitution, and not merely on the personal philosophies, be they libertarian or authoritarian, of the judges of the majority. While constitutional adjudication involves judgments of value, it remains the case that some values are indeed "extraconstitutional," in that they have no roots in the Constitution that the people have chosen. The Court's decision in *Lochner* v. *New York,* 198 U. S. 45 (1905), was wrong because it rested on the Court's belief that the liberty to engage in a trade or occupation without governmental regulation was somehow fundamental—an assessment of value that was unsupported by the Constitution. I believe that *Roe* v. *Wade*—and today's decision as well—rests on similarly extraconstitutional assessments of the value of the liberty to choose an abortion.

of it. Rather, we have recognized that the States may legitimately adopt a policy of encouraging normal childbirth rather than abortion so long as the measures through which that policy is implemented do not amount to direct compulsion of the woman's choice regarding abortion. *Harris* v. *McRae*, 448 U. S. 297 (1980); *Maher* v. *Roe*, 432 U. S. 464 (1977); *Beal* v. *Doe*, 432 U. S. 438 (1977). The provisions before the Court today quite obviously represent the State's effort to implement such a policy.

The majority's opinion evinces no deference toward the State's legitimate policy. Rather, the majority makes it clear from the outset that it simply disapproves of any attempt by Pennsylvania to legislate in this area. The history of the state legislature's decade-long effort to pass a constitutional abortion statute is recounted as if it were evidence of some sinister conspiracy. See *ante*, at 751–752. In fact, of course, the legislature's past failure to predict the evolution of the right first recognized in *Roe* v. *Wade* is understandable and is in itself no ground for condemnation. Moreover, the legislature's willingness to pursue permissible policies through means that go to the limits allowed by existing precedents is no sign of *mens rea*. The majority, however, seems to find it necessary to respond by changing the rules to invalidate what before would have seemed permissible. The result is a decision that finds no justification in the Court's previous holdings, departs from sound principles of constitutional and statutory interpretation, and unduly limits the State's power to implement the legitimate (and in some circumstances compelling) policy of encouraging normal childbirth in preference to abortion.

A

The Court begins by striking down statutory provisions designed to ensure that the woman's choice of an abortion is fully informed—that is, that she is aware not only of the reasons for having an abortion, but also of the risks associated with an abortion and the availability of assistance that might

make the alternative of normal childbirth more attractive than it might otherwise appear. At first blush, the Court's action seems extraordinary: after all, *Roe* v. *Wade* purports to be about freedom of choice, and statutory provisions requiring that a woman seeking an abortion be afforded information regarding her decision not only do not limit her ability to choose abortion, but also would appear to enhance her freedom of choice by helping to ensure that her decision whether or not to terminate her pregnancy is an informed one. Indeed, maximization of the patient's freedom of choice—not restriction of his or her liberty—is generally perceived to be the principal value justifying the imposition of disclosure requirements upon physicians:

> "The root premise is the concept, fundamental in American jurisprudence, that '[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body. . . . ' True consent to what happens to one's self is the informed exercise of a choice, and that entails an opportunity to evaluate knowledgeably the options available and the risks attendant upon each. The average patient has little or no understanding of the medical arts, and ordinarily has only his physician to whom he can look for enlightenment with which to reach an intelligent decision. From these almost axiomatic considerations springs the need, and in turn the requirement, of a reasonable divulgence by physician to patient to make such a decision possible." *Canterbury* v. *Spence*, 150 U. S. App. D. C. 263, 271, 464 F. 2d 772, 780 (1972).

One searches the majority's opinion in vain for a convincing reason why the apparently laudable policy of promoting informed consent becomes unconstitutional when the subject is abortion. The majority purports to find support in *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416 (1983). But *Akron* is not controlling. The informed-

consent provisions struck down in that case, as characterized by the majority, required the physician to advance tendentious statements concerning the unanswerable question of when human life begins, to offer merely speculative descriptions of the anatomical features of the fetus carried by the woman seeking the abortion, and to recite a "parade of horribles" suggesting that abortion is "a particularly dangerous procedure." *Id.*, at 444–445. I have no quarrel with the general proposition, for which I read *Akron* to stand, that a campaign of state-promulgated disinformation cannot be justified in the name of "informed consent" or "freedom of choice." But the Pennsylvania statute before us cannot be accused of sharing the flaws of the ordinance at issue in *Akron.* As the majority concedes, the statute does not, on its face, require that the patient be given any information that is false or unverifiable. Moreover, it is unquestionable that all of the information required would be relevant in many cases to a woman's decision whether or not to obtain an abortion.

Why, then, is the statute unconstitutional? The majority's argument, while primarily rhetorical, appears to offer three answers. First, the information that must be provided will in some cases be irrelevant to the woman's decision. This is true. Its pertinence to the question of the statute's constitutionality, however, is beyond me. Legislators are ordinarily entitled to proceed on the basis of rational generalizations about the subject matter of legislation, and the existence of particular cases in which a feature of a statute performs no function (or is even counterproductive) ordinarily does not render the statute unconstitutional or even constitutionally suspect. Only where the statute is subject to heightened scrutiny by virtue of its impingement on some fundamental right or its employment of a suspect classification does the imprecision of the "fit" between the statute's ends and means become potentially damning. Here, there is nothing to trigger such scrutiny, for the statute does not di-

rectly infringe the allegedly fundamental right at issue—the woman's right to choose an abortion. Indeed, I fail to see how providing a woman with accurate information—whether relevant or irrelevant—could ever be deemed to impair *any* constitutionally protected interest (even if, as the majority hypothesizes, the information may upset her). Thus, the majority's observation that the statute may require the provision of irrelevant information in some cases is itself an irrelevancy.

Second, the majority appears to reason that the informed-consent provisions are invalid because the information they require may increase the woman's "anxiety" about the procedure and even "influence" her in her choice. Again, both observations are undoubtedly true; but they by no means cast the constitutionality of the provisions into question. It is in the very nature of informed-consent provisions that they may produce some anxiety in the patient and influence her in her choice. This is in fact their reason for existence, and—provided that the information required is accurate and non-misleading—it is an entirely salutary reason. If information may reasonably affect the patient's choice, the patient should have that information; and, as one authority has observed, "the greater the likelihood that particular information will influence [the patient's] decision, the more essential the information arguably becomes for securing her informed consent." Appleton, Doctors, Patients and the Constitution, 63 Wash. U. L. Q. 183, 211 (1985). That the result of the provision of information may be that some women will forgo abortions by no means suggests that providing the information is unconstitutional, for the ostensible objective of *Roe* v. *Wade* is not maximizing the number of abortions, but maximizing choice. Moreover, our decisions in *Maher*, *Beal*, and *Harris* v. *McRae* all indicate that the State may encourage women to make their choice in favor of childbirth rather than abortion, and the provision of accurate information regarding abortion

and its alternatives is a reasonable and fair means of achieving that objective.

Third, the majority concludes that the informed-consent provisions are invalid because they "intrud[e] upon the discretion of the pregnant woman's physician," *ante*, at 762, violate "the privacy of the informed-consent dialogue between the woman and her physician," *ibid.*, and "officially structur[e]" that dialogue, *ante*, at 763. The provisions thus constitute "state medicine" that "infringes upon [the physician's] professional responsibilities." *Ibid.* This is nonsensical. I can concede that the Constitution extends its protection to certain zones of personal autonomy and privacy, see *Griswold* v. *Connecticut*, 381 U. S., at 502 (WHITE, J., concurring in judgment), and I can understand, if not share, the notion that that protection may extend to a woman's decision regarding abortion. But I cannot concede the possibility that the Constitution provides more than minimal protection for the manner in which a physician practices his or her profession or for the "dialogues" in which he or she chooses to participate in the course of treating patients. I had thought it clear that regulation of the practice of medicine, like regulation of other professions and of economic affairs generally, was a matter peculiarly within the competence of legislatures, and that such regulation was subject to review only for rationality. See, *e. g., Williamson* v. *Lee Optical of Oklahoma, Inc.*, 348 U. S. 483 (1955).

Were the Court serious about the need for strict scrutiny of regulations that infringe on the "judgment" of medical professionals, "structure" their relations with their patients, and amount to "state medicine," there is no telling how many state and federal statutes (not to mention principles of state tort law) governing the practice of medicine might be condemned. And of course, there would be no reason why a concern for professional freedom could be confined to the medical profession: nothing in the Constitution indicates a preference for the liberty of doctors over that of lawyers,

accountants, bakers, or brickmakers. Accordingly, if the State may not "structure" the dialogue between doctor and patient, it should also follow that the State may not, for example, require attorneys to disclose to their clients information concerning the risks of representing the client in a particular proceeding. Of course, we upheld such disclosure requirements only last Term. See *Zauderer* v. *Office of Disciplinary Counsel*, 471 U. S. 626 (1985).

The rationale for state efforts to regulate the practice of a profession or vocation is simple: the government is entitled not to trust members of a profession to police themselves, and accordingly the legislature may for the most part impose such restrictions on the practice of a profession or business as it may find necessary to the protection of the public. This is precisely the rationale for infringing the professional freedom of doctors by imposing disclosure requirements upon them: "Respect for the patient's right of self-determination on particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves." *Canterbury* v. *Spence*, 150 U. S. App. D. C., at 275, 464 F. 2d, at 784. Unless one is willing to recast entirely the law with respect to the legitimacy of state regulation of professional conduct, the obvious rationality of the policy of promoting informed patient choice on the subject of abortion must defeat any claim that the disclosure requirements imposed by Pennsylvania are invalid because they infringe on "professional freedom" or on the "physician-patient relationship."

I do not really believe that the Court's invocation of professional freedom signals a retreat from the principle that the Constitution is largely unconcerned with the substantive aspects of governmental regulation of professional and business relations. Clearly, the majority is uninterested in undermining the edifice of post-New Deal constitutional law by extending its holding to cases that do not concern the issue of abortion. But if one assumes, as I do, that the majority

is unwilling to commit itself to the implications of that part of its rhetoric which smacks of economic due process rights for physicians, it becomes obvious that the talk of "infringement of professional responsibility" is mere window dressing for a holding that must stand or fall on other grounds. And because the informed-consent provisions do not infringe the essential right at issue—the right of the woman to choose to have an abortion—the majority's conclusion that the provisions are unconstitutional is without foundation.

B

The majority's decision to strike down the reporting requirements of the statute is equally extraordinary. The requirements obviously serve legitimate purposes. The information contained in the reports is highly relevant to the State's efforts to enforce § 3210(a) of the statute, which forbids abortion of viable fetuses except when necessary to the mother's health. The information concerning complications plainly serves the legitimate goal of advancing the state of medical knowledge concerning maternal and fetal health. See *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S., at 80. Given that the subject of abortion is a matter of considerable public interest and debate (constrained to some extent, of course, by the pre-emptive effect of this Court's ill-conceived constitutional decisions), the collection and dissemination of demographic information concerning abortions is clearly a legitimate goal of public policy. Moreover, there is little reason to believe that the required reports, though fairly detailed, would impose an undue burden on physicians and impede the ability of their patients to obtain abortions, as all of the information required would necessarily be readily available to a physician who had performed an abortion. Accordingly, under this Court's prior decisions in this area, the reporting requirements are constitutional. *Planned Parenthood Assn. of Kansas City, Missouri, Inc.* v. *Ashcroft,* 462 U. S. 476, 486–490 (1983) (opinion of Pow-

ELL, J.); *id.*, at 505 (opinion of O'CONNOR, J.); *Planned Parenthood of Central Missouri* v. *Danforth, supra,* at 79–81.

Nonetheless, the majority strikes down the reporting requirements because it finds that notwithstanding the explicit statutory command that the reports be made public only in a manner ensuring anonymity, "the amount of information about [the patient] and the circumstances under which she had an abortion are so detailed that identification is likely," *ante,* at 767, and that "[i]dentification is the obvious purpose of these extreme reporting requirements," *ibid.* Where these "findings" come from is mysterious, to say the least. The Court of Appeals did not make any such findings on the record before it, and the District Court expressly found that "the requirements of confidentiality in § 3214(e) regarding the identity of both patient and physician prevent any invasion of privacy which could present a legally significant burden on the abortion decision." 552 F. Supp. 791, 804 (ED Pa. 1982). Rather than pointing to anything in the record that demonstrates that the District Court's conclusion is erroneous, the majority resorts to the handy, but mistaken, solution of substituting its own view of the facts and strikes down the statute.

I can accept the proposition that a statute whose purpose and effect are to allow harassment and intimidation of citizens for their constitutionally protected conduct is unconstitutional, but the majority's action in striking down the Pennsylvania statute on this basis is procedurally and substantively indefensible. First, it reflects a complete disregard for the principle, embodied in Federal Rule of Civil Procedure 52(a), that an appellate court must defer to a trial court's findings of facts unless those findings are clearly erroneous. The Rule is expressly applicable to findings of fact that constitute the grounds for a district court's action granting or refusing a preliminary injunction, and, of course, the Rule limits this Court to the same degree as it does any other

federal appellate court, see *United States* v. *General Dynamics Corp.*, 415 U. S. 486 (1974).

Second, the majority has seriously erred in purporting to make a final determination of fact, conclusive of the constitutionality of the statute, on a motion for preliminary injunction. In so doing, the Court overlooks the principle that although a district court's findings of fact on a motion for a preliminary injunction are entitled to deference on appeal from the grant or denial of preliminary relief, "the findings of fact . . . made by a court granting a preliminary injunction are *not* binding at trial on the merits" because "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *University of Texas* v. *Camenisch*, 451 U. S. 390, 395 (1981) (emphasis added). What *Camenisch* stated to be true customarily is also true in this case: the record on which the motion for preliminary injunction was decided in the trial court consisted solely of affidavits and a stipulation of undisputed facts, none of which provides a sufficient basis for a conclusive finding on the complex question of the motive and effect of the reporting requirements and the adequacy of the statute's protection of the anonymity of doctors and patients. Issuing what amounts to a final declaratory judgment on the constitutionality of the statute under these circumstances is highly inappropriate.

Finally, in addition to being procedurally flawed, the majority's holding is substantively suspect. The information contained in the reports identifies the patient on the basis of age, race, marital status, and "political subdivision" of residence; the remainder of the information included in the reports concerns the medical aspects of the abortion. It is implausible that a particular patient could be identified on the basis of the combination of the general identifying information and the specific medical information in these reports by anyone who did not already know (at a minimum) that the woman had been pregnant and obtained an abortion.

Accordingly, the provisions pose little or no threat to the woman's privacy.

In sum, there is no basis here even for a preliminary injunction against the reporting provisions of the statute, much less for a final determination that the provisions are unconstitutional.

## C

The majority resorts to linguistic nit-picking in striking down the provision requiring physicians aborting viable fetuses to use the method of abortion most likely to result in fetal survival unless that method would pose a "significantly greater medical risk to the life or health of the pregnant woman" than would other available methods. The majority concludes that the statute's use of the word "significantly" indicates that the statute represents an unlawful "trade-off" between the woman's health and the chance of fetal survival. Not only is this conclusion based on a wholly unreasonable interpretation of the statute, but the statute would also be constitutional even if it meant what the majority says it means.

The majority adopts the Court of Appeals' view that the statute's use of the term "significantly" renders it "'not susceptible to a construction that does not require the mother to bear an increased medical risk in order to save her viable fetus.'" *Ante*, at 769 (quoting 737 F. 2d 283, 300 (CA3 1984)). The term "significant" in this context, however, is most naturally read as synonymous with the terms "meaningful," "cognizable," "appreciable," or "nonnegligible." That is, the statute requires only that the risk be a real and identifiable one. Surely, if the State's interest in preserving the life of a viable fetus is, as *Roe* purported to recognize, a compelling one, the State is at the very least entitled to demand that that interest not be subordinated to a purported maternal health risk that is in fact wholly insubstantial. The statute, on its face, demands no more than this of a doctor performing an abortion of a viable fetus.

Even if the Pennsylvania statute is properly interpreted as requiring a pregnant woman seeking abortion of a viable fetus to endure a method of abortion chosen to protect the health of the fetus despite the existence of an alternative that in some substantial degree is more protective of her own health, I am not convinced that the statute is unconstitutional. The Court seems to read its earlier opinion in *Colautti* v. *Franklin*, 439 U. S. 379 (1979), as incorporating a holding that tradeoffs between the health of the pregnant woman and the survival of her viable fetus are constitutionally impermissible under *Roe* v. *Wade*. Of course, *Colautti* held no such thing: the Court there stated only that it did not address the "serious ethical and constitutional difficulties" that such a tradeoff would present. 439 U. S., at 400.[6] Nothing in *Colautti* or any of the Court's previous abortion decisions compels the *per se* "tradeoff" rule the Court adopts today.

The Court's ruling in this respect is not even *consistent* with its decision in *Roe* v. *Wade*. In *Roe*, the Court conceded that the State's interest in preserving the life of a viable fetus is a compelling one, and the Court has never disavowed that concession. The Court now holds that this compelling interest cannot justify *any* regulation that imposes a quantifiable medical risk upon the pregnant woman who seeks to abort a viable fetus: if attempting to save the fetus imposes any additional risk of injury to the woman, she must be permitted to kill it. This holding hardly accords with the usual understanding of the term "compelling interest," which we have used to describe those governmental interests that are so weighty as to justify substantial and ordinarily impermissible impositions on the individual—impositions that, I had thought, could include the infliction of

---

[6] Interestingly, the Court's statement seems to have assumed that the Court would have had the same authority over "ethical questions" as "constitutional issues" had it chosen to reach them—an illuminating revelation of the state of the Court's jurisprudence in this area.

some degree of risk of physical harm. The most obvious illustration of this principle may be found in the opinion of the elder Justice Harlan in *Jacobson* v. *Massachusetts*, 197 U. S. 11, 29 (1905): "The liberty secured by the Fourteenth Amendment . . . consists, in part, in the right of a person 'to live and work where he will,' *Allgeyer* v. *Louisiana*, 165 U. S. 578; and yet he may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, . . . to take his place in the ranks of the army of his country and risk the chance of being shot down in its defense." The actual holding of *Jacobson* provides another illustration, more pertinent to this particular case: the Court there sustained a regulation requiring all adult citizens of Cambridge, Massachusetts, to be vaccinated against smallpox, notwithstanding that exposure to vaccination carried with it a statistical possibility of serious illness and even death. If, as I believe these examples demonstrate, a compelling state interest may justify the imposition of some physical danger upon an individual, and if, as the Court has held, the State has a compelling interest in the preservation of the life of a viable fetus, I find the majority's unwillingness to tolerate the imposition of *any* nonnegligible risk of injury to a pregnant woman in order to protect the life of her viable fetus in the course of an abortion baffling.

The Court's ruling today that any tradeoff between the woman's health and fetal survival is impermissible is not only inconsistent with *Roe*'s recognition of a compelling state interest in viable fetal life; it directly contradicts one of the essential holdings of *Roe*—that is, that the State may forbid *all* postviability abortions except when *necessary* to protect the life or health of the pregnant woman. As is evident, this holding itself involves a tradeoff between maternal health and protection of the fetus, for it plainly permits the State to forbid a postviability abortion even when such an abortion may be statistically safer than carrying the pregnancy to

term, provided that the abortion is not medically necessary.[7] The tradeoff contained in the Pennsylvania statute, even as interpreted by the majority, is no different in kind: the State has simply required that when an abortion of some kind is medically necessary, it shall be conducted so as to spare the fetus (to the greatest degree possible) unless a method less protective of the fetus is itself to some degree medically necessary for the woman. That this choice may involve the imposition of some risk on the woman undergoing the abortion should be no more troublesome than that a prohibition on nonnecessary postviability abortions may involve the imposition of some risk on women who are thereby forced to continue their pregnancies to term; yet for some reason, the Court concludes that whereas the tradeoffs it devises are compelled by the Constitution, the essentially indistinguishable tradeoff the State has attempted is foreclosed. This cannot be the law.

The framework of rights and interests devised by the Court in *Roe* v. *Wade* indicates that just as a State may prohibit a postviability abortion unless it is necessary to protect the life or health of the woman, the State may require that postviability abortions be conducted using the method most protective of the fetus unless a less protective method is necessary to protect the life or health of the woman. Under this standard, the Pennsylvania statute—which does not require the woman to accept any significant health risks to protect the fetus—is plainly constitutional.

## D

The Court strikes down the statute's second-physician requirement because, in its view, the existence of a medical emergency requiring an immediate abortion to save the life of the pregnant woman would not be a defense to a prosecution

---

[7] Surely it cannot be argued that any abortion that is safer than delivery is medically necessary, since under such a definition an abortion would be medically necessary in all pregnancies.

under the statute. The Court does not question the proposition, established in the *Ashcroft* case, that a second-physician requirement accompanied by an exception for emergencies is a permissible means of vindicating the compelling state interest in protecting the lives of viable fetuses. Accordingly, the majority's ruling on this issue does not on its face involve a substantial departure from the Court's previous decisions.

What is disturbing about the Court's opinion on this point is not the general principle on which it rests, but the manner in which that principle is applied. The Court brushes aside the fact that the section of the statute in which the second-physician requirement is imposed states that "[i]t shall be a complete defense to *any* charge brought against a physician for violating the requirements *of this section* that he had concluded, in good faith, in his best medical judgment, . . . that the abortion was necessary to preserve maternal life or health" (emphasis added). 18 Pa. Cons. Stat. § 3210(a) (1982). This language is obviously susceptible of the construction the State advances: namely, that it is a defense to a charge of violating the second-physician requirement that the physician performing the abortion believed that performing an abortion in the absence of a second physician was necessary to the life or health of the mother.

The Court's rejection of this construction is based on its conclusion that the statutory language "does not relate to the second-physician requirement" and that "its words are not words of emergency." *Ante*, at 771. This reasoning eludes me. The defense of medical necessity "relates" to any charge that a doctor has violated one of the requirements of the section in which it appears, and the second-physician requirement is imposed by that section. The defense thus quite evidently "relates" to the second-physician requirement. True, the "words" of the defense are not "words of emergency," but words of necessity. Why this should make a difference is unclear: a defense of medical necessity is fully as protective of the interests of the pregnant woman as a defense of

"emergency." The Court falls back, *ibid.*, on the notion that the legislature "knows how to provide a medical-emergency exception when it chooses to do so." No doubt. But the legislature obviously also "knows how" to provide a medical-necessity exception, and it has done so. Why this exception is insufficient is unexplained and inexplicable.

The Court's rejection of a perfectly plausible reading of the statute flies in the face of the principle—which until today I had thought applicable to abortion statutes as well as to other legislative enactments—that "[w]here fairly possible, courts should construe a statute to avoid a danger of unconstitutionality." *Planned Parenthood Assn. of Kansas City, Missouri, Inc.* v. *Ashcroft*, 462 U. S., at 493. The Court's reading is obviously based on an entirely different principle: that in cases involving abortion, a permissible reading of a statute is to be avoided at all costs. Not sharing this viewpoint, I cannot accept the majority's conclusion that the statute does not provide for the equivalent of a defense of emergency.[8]

### E

Finally, the majority refuses to vacate the preliminary injunction entered against the enforcement of the parental notice and consent provisions of the statute. See *ante*, at 758, n. 9. The reason offered is that the propriety of the injunction depends upon the adequacy of the rules, recently promulgated by the Pennsylvania Supreme Court, setting forth

---

[8] Even if I were to accept the majority's conclusion that the medical-necessity defense of § 3210(a) is not specifically applicable to charges brought under § 3210(c), I would not strike down the statute. Under Pennsylvania criminal law, justification is a defense, see 18 Pa. Cons. Stat. § 502 (1982), and, under the general rule of justification, conduct is deemed justified if "the actor believes [it] to be necessary to avoid a harm or evil to . . . another," and "the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged." § 503(a)(1). I have little doubt that a Pennsylvania court applying this statute would find noncompliance with the second-physician rule justified where necessary to save the life of the pregnant woman.

procedures by which a minor desiring an abortion may speedily and confidentially obtain either judicial approval of her decision to obtain an abortion or a judicial determination that she herself is capable of an informed consent to the procedure. The Court concludes that review of the rules is best carried out in the first instance in the District Court.

The Court's decision in *Ashcroft*, however, compels the conclusion that the Third Circuit erred in directing that the operation of the parental notice and consent provisions be enjoined pending promulgation of the required rules; accordingly, the injunction should be vacated irrespective of the adequacy of those rules. As the Court of Appeals apparently recognized, the Pennsylvania statute, on its face, is substantively identical to that upheld by the Court in *Ashcroft*; thus, the sole basis for the injunction ordered by the Court of Appeals was the absence of procedural rules implementing the statute. What the Court of Appeals failed to recognize was that this Court denied relief to the plaintiffs challenging the statute in *Ashcroft* despite the same purported defect: in that case, as in this, the State Supreme Court had not yet promulgated rules establishing the expedited procedures called for by the statute. Nonetheless, as JUSTICE POWELL's opinion explained, the plaintiffs were not entitled to any relief against enforcement of the statutory scheme, as "[t]here is no reason to believe that [the State] will not expedite any appeal consistent with the mandate in our prior opinions." 462 U. S., at 491, n. 16. Similarly, there was no reason here for the Court of Appeals to believe that Pennsylvania would not provide for the adequate, expedited procedures contemplated by the statute; thus, its entry of an injunction against enforcement of the statute was erroneous.

## III

The decision today appears symptomatic of the Court's own insecurity over its handiwork in *Roe* v. *Wade* and the cases following that decision. Aware that in *Roe* it essen-

tially created something out of nothing and that there are many in this country who hold that decision to be basically illegitimate, the Court responds defensively. Perceiving, in a statute implementing the State's legitimate policy of preferring childbirth to abortion, a threat to or criticism of the decision in *Roe* v. *Wade,* the majority indiscriminately strikes down statutory provisions that in no way contravene the right recognized in *Roe.* I do not share the warped point of view of the majority, nor can I follow the tortuous path the majority treads in proceeding to strike down the statute before us. I dissent.

JUSTICE O'CONNOR, with whom JUSTICE REHNQUIST joins, dissenting.

This Court's abortion decisions have already worked a major distortion in the Court's constitutional jurisprudence. See *Akron* v. *Akron Center for Reproductive Health, Inc.,* 462 U. S. 416, 452 (1983) (O'CONNOR, J., dissenting). Today's decision goes further, and makes it painfully clear that no legal rule or doctrine is safe from ad hoc nullification by this Court when an occasion for its application arises in a case involving state regulation of abortion. The permissible scope of abortion regulation is not the only constitutional issue on which this Court is divided, but—except when it comes to abortion—the Court has generally refused to let such disagreements, however longstanding or deeply felt, prevent it from evenhandedly applying uncontroversial legal doctrines to cases that come before it. See *Heckler* v. *Chaney,* 470 U. S. 821, 838 (1985); *id.,* at 839–840, n. 2 (BRENNAN, J., concurring) (differences over the validity of the death penalty under the Eighth Amendment should not influence the Court's consideration of a question of statutory administrative law). That the Court's unworkable scheme for constitutionalizing the regulation of abortion has had this institutionally debilitating effect should not be surprising, however, since the Court is not suited to the expansive role it

has claimed for itself in the series of cases that began with *Roe* v. *Wade*, 410 U. S. 113 (1973).

The Court today holds that "[t]he Court of Appeals correctly invalidated the specified provisions of Pennsylvania's 1982 Abortion Control Act." *Ante*, at 772. In so doing, the Court prematurely decides serious constitutional questions on an inadequate record, in contravention of settled principles of constitutional adjudication and procedural fairness. The constitutionality of the challenged provisions was not properly before the Court of Appeals, and is not properly before this Court. There has been no trial on the merits, and appellants have had no opportunity to develop facts that might have a bearing on the constitutionality of the statute. The only question properly before the Court is whether or not a preliminary injunction should have been issued to restrain enforcement of the challenged provisions pending trial on the merits. This Court's decisions in *Akron* v. *Akron Center for Reproductive Health, supra, Planned Parenthood Assn. of Kansas City, Missouri, Inc.* v. *Ashcroft*, 462 U. S. 476 (1983), and *Simopoulos* v. *Virginia*, 462 U. S. 506 (1983), do not establish a likelihood that appellees would succeed on the merits of their constitutional claims sufficient to warrant overturning the District Court's denial of a preliminary injunction. Under the approach to abortion regulation outlined in my dissenting opinion in *Akron*, to which I adhere, it is even clearer that no preliminary injunction should have issued. I therefore dissent.

I

The only issue before the District Court in this case was whether to grant appellees' motion for a preliminary injunction against enforcement of Pennsylvania's Abortion Control Act. The limited record before the District Court consisted of affidavits submitted by appellees, the parties' memoranda of law, the Act itself, including the findings of the Pennsylvania Legislature, and a stipulation of uncontested facts. As

the District Judge noted, this stipulation "was entered into solely for the purpose of the motion for preliminary injunction." 552 F. Supp. 791, 794, n. 1 (ED Pa. 1982). Indeed, the parties expressly provided that the stipulation should be "without prejudice to any party's right to controvert any facts or to prove any additional facts at any later proceeding in this action." App. 9a–10a. In light of the stipulation of uncontested facts, no testimony or evidence was submitted at the hearing on the motion for a preliminary injunction.

In these circumstances, the District Judge's consideration of the motion before him was governed by the black letter law recapitulated in *University of Texas* v. *Camenisch,* 451 U. S. 390, 395 (1981):

> "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.
>
> "Should an expedited decision on the merits be appropriate, Rule 65(a)(2) of the Federal Rules of Civil Procedure provides a means of securing one. That Rule permits a court to 'order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.' Before such an order may issue, however, the courts have commonly required that 'the parties should normally receive clear and unambiguous notice [of

the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases'" (citations omitted).

The District Judge scrupulously adhered to these settled principles. He granted the preliminary injunction as to one provision of the Act, and denied preliminary relief as to all the other challenged provisions. Having seen no occasion to issue a Rule 65 order, he properly refrained from rendering final judgment on the merits by declaratory judgment or otherwise. That the District Judge understood the preliminary nature of the proceedings, and ruled accordingly, is incontrovertible:

"I have applied the traditional criteria applicable to a motion for preliminary injunction: likelihood of success on the merits, irreparable harm if the relief is not granted, possibility of harm to the non-moving party, and where relevant, harm to the public. Given the importance of the right involved in this litigation, I have assumed that if the plaintiffs were able to show likelihood of success on the merits, then the irreparable harm requirement would be met. I conclude that in only one instance, the 24-hour waiting period, did the plaintiffs carry their burden of demonstrating likelihood of success on the merits.

.        .        .        .        .

"My adjudication is limited to the plaintiffs' request for a *preliminary* injunction. It is circumscribed by the record produced by the parties and the arguments advanced in the briefs on this motion. After applying the criteria for a preliminary injunction, I conclude that the only portion of the Act which the plaintiffs have demonstrated should be preliminarily enjoined is the 24-hour waiting period. In all other respects, the plaintiffs have failed to show a right to a preliminary injunction pending

the outcome of the trial on the merits." 552 F. Supp., at 811 (emphasis in original).

The District Judge correctly discerned that "[t]he traditional standard for granting a preliminary injunction requires a plaintiff to show that in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits." *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931 (1975). Unsurprisingly, the likelihood of success on the merits emerged, in the District Judge's view, as the most important factor in determining whether an injunction should issue in this case. In sum, when the District Judge denied appellees' motion for a preliminary injunction, he faithfully applied uncontroversial criteria for ruling on such motions and rendered a decision that "was not in any sense intended as a final decision as to the constitutionality of the challenged statute." *Brown* v. *Chote*, 411 U. S. 452, 456 (1973).

When the appeal was taken to the Court of Appeals for the Third Circuit, that court's review should have been limited to determining whether the District Court had abused its discretion in denying *preliminary* relief. *Doran, supra,* at 931–932; *Brown, supra,* at 457. If the Court of Appeals concluded that the District Court had committed legal errors that infected its assessment of the likelihood that appellees would succeed on the merits, the Court of Appeals should then have addressed the remaining factors that make up the preliminary injunction inquiry. If it concluded that denial of the preliminary injunction was an abuse of discretion, it should have entered judgment providing for entry of a preliminary injunction. What it should *not* have done, and what it did do, was to issue a final, binding declaration on the merits of appellees' constitutional claims.

The Court concedes that a court of appeals should ordinarily review the denial of a preliminary injunction under an abuse of discretion standard, and it concedes that a court of appeals should ordinarily confine itself to assessing the "probability that the plaintiffs would succeed on the merits."

*Ante*, at 755. But the Court purports to find an exception to this rule in the decisions in *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579 (1952), and *Smith* v. *Vulcan Iron Works*, 165 U. S. 518 (1897). It asserts that these cases indicate that "if a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, that ruling may be reviewed even though the appeal is from the entry of a preliminary injunction." *Ante*, at 757. The Court then announces that the requirement that appellate review proceed under the deferential abuse of discretion standard is "a rule of orderly judicial administration, not a limit on judicial power." *Ibid.* Postulating that the Court of Appeals had a "full record before it on the issues now before us," *ibid.*, the Court concludes that this "full record," and the fact that this Court's decisions in *Akron*, *Ashcroft*, and *Simopoulos* were handed down during the pendency of the appeal, justified the Court of Appeals "in proceeding to plenary review of those issues." *Ante*, at 757.

This analysis mischaracterizes the proceedings in the District Court and is unsupported by precedent or logic. No one doubts that the legal premises on which the District Judge proceeded were reviewable. But the fact is that the District Judge did not make the final, definitive "ruling" on the merits the Court imputes to him. The only "ruling" the Court of Appeals had before it with respect to the merits was a determination of "likelihood of success" based on facts which were stipulated *only* for purposes of the preliminary injunction motion, and on arguments framed with a view toward only those facts. Nor was there a "full record" upon which the Court of Appeals could decide the merits. The Court falls into precisely the error pointed out in *Camenisch*, 451 U. S., at 394, where this Court unanimously rejected the proposition that determinations on the propriety of preliminary relief are "tantamount to decisions on the underlying merits," because that view "improperly equates 'likelihood of

success' with 'success,' and what is more important, . . . ignores the significant procedural differences between preliminary and permanent injunctions."

The Court of Appeals was convinced that the District Judge, in reliance on the decisions of the Courts of Appeals that were later reviewed in *Akron* and *Ashcroft*, had taken a view of the applicable law which this Court's decisions in those cases demonstrated to be erroneous. Citing *Apple Computer, Inc.* v. *Franklin Computer Corp.*, 714 F. 2d 1240, 1242 (CA3 1983), cert. dism'd under this Court's Rule 53, 464 U. S. 1033 (1984), the Court of Appeals stated that "[t]he customary discretion accorded to a district court's ruling on a preliminary injunction yields to our plenary scope of review as to the applicable law." 737 F. 2d 283, 290 (1984). *Apple Computer*, in turn, relied on Judge Friendly's opinion for the Second Circuit in *Donovan* v. *Bierwirth*, 680 F. 2d 263, 269, cert. denied, 459 U. S. 1069 (1982): "Despite oft repeated statements that the issuance of a preliminary injunction rests in the discretion of the trial judge whose decisions will be reversed only for 'abuse', a court of appeals must reverse if the district court has proceeded on the basis of an erroneous view of the applicable law, or of the standards governing the granting or denial of interlocutory relief" (citations omitted).

*Donovan*'s reasoning, however, goes only to the *standard* of appellate review, not to the *extent* of the issues to be reviewed. Whether or not *Donovan*'s approach is sound, it is clear that a district court does not have discretion to rule on the basis of a misapprehension of controlling law. But even assuming, *arguendo*, that, where a court of appeals detects such an error, it may then engage in *de novo* review of the determination whether a preliminary injunction should issue, see 680 F. 2d, at 270, such discretion does not ordinarily extend to deciding the merits of the controversy with finality. Judge Friendly did no such thing in *Donovan, id.*,

at 276, nor did the Third Circuit in *Apple Computer*, see 714 F. 2d, at 1242.

What is at issue here is a matter of legal principle. As JUSTICE BLACKMUN has observed on a previous occasion: "The distinction between the preliminary and final injunction stages of a proceeding is more than mere formalism. The time pressures involved in a request for a preliminary injunction require courts to make determinations without the aid of full briefing or factual development, and make all such determinations necessarily provisional." *Firefighters* v. *Stotts*, 467 U. S. 561, 603–604, n. 7 (1984) (dissenting opinion). The holding of the Court today thus comes at the expense of the basic principle underlying the framework set out in *Camenisch* for ruling on a motion for a preliminary injunction: that fairness to the parties and reliable adjudication of disputes require final, binding rulings on the merits of a controversy to be made only after each side has had an opportunity to establish its version of the disputed facts or to establish that the facts are not in dispute.

Equally neglected by the Court is a second principle, closely related to the first:

> "Ordinarily an appellate court does not give consideration to issues not raised below. For our procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact. This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." *Hormel* v. *Helvering*, 312 U. S. 552, 556 (1941).

See also *Singleton* v. *Wulff*, 428 U. S. 106, 120–121 (1976); cf. *Fountain* v. *Filson*, 336 U. S. 681, 683 (1949) *(per curiam)* (reversing a summary judgment order "made on appeal on a

new issue as to which the opposite party had no opportunity to present a defense before the trial court"). The cases on which the Court relies simply do not support the short shrift the Court gives these basic principles.

In *Youngstown Sheet & Tube Co.*, President Truman, invoking an immediate threat to the national defense precipitated by a threatened nationwide strike in the steel industry, ordered the Secretary of Commerce to seize the steel mills and keep them running. 343 U. S., at 583. The steel companies sought a declaratory judgment, a preliminary injunction, and a permanent injunction against the seizure, on the grounds that the President had no authority to order it. *Ibid.* Although the District Court had before it only "motions for temporary injunctions" when it ruled, 103 F. Supp. 569, 572 (DC 1952), "in the light of the facts presented, the District Court saw no reason for delaying decision of the constitutional validity of the orders." *Youngstown Sheet & Tube Co., supra*, at 585. Indeed, the District Court had "com[e] to a fixed conclusion . . . that defendant's acts are illegal. . . . Nothing that could be submitted at such trial on the facts would alter the legal conclusion I have reached." 103 F. Supp., at 576.

Thus, the District Court's preliminary injunction in *Youngstown Sheet & Tube Co.* rested on what amounted to a declaratory judgment that the orders were constitutionally invalid. That in itself was a pronounced departure from normal practice, although one that this Court found proper in the highly unusual circumstances presented in *Youngstown Sheet & Tube Co.*, where time was manifestly of the essence,* and there was no contention that the Government had been deprived of an opportunity to present facts that could have

---

*The extraordinary importance of prompt resolution of the steel companies' claims is shown by the fact that this Court granted certiorari before judgment in the Court of Appeals three days after the District Court ruled, and set the case for argument nine days later, "[d]eeming it best that the issues raised be promptly decided by this Court." 343 U. S., at 584.

altered the resolution of the constitutional question. To the contrary, when "[p]laintiffs moved for a preliminary injunction before answer or hearing, [d]efendant opposed the motion, filing uncontroverted affidavits of Government officials describing the facts underlying the President's order." 343 U. S., at 678 (Vinson, C. J., dissenting).

Neither of the foregoing justifications for the District Court's unusual decision to reach the merits in *Youngstown Sheet & Tube* is present here. No emergency remotely comparable to the one in *Youngstown Sheet & Tube* confronted the Court of Appeals, which granted appellees' motion to enjoin enforcement of the entire Act pending appeal, and withheld judgment until after this Court had ruled in *Akron* and its companion cases. 737 F. 2d, at 290. Appellants conceded in the Court of Appeals that several provisions of the Abortion Act were unconstitutional in the wake of those decisions, but appellants did not concede that the provisions on which the Court of Appeals dispositively ruled were unconstitutional. Nor is there any suggestion that appellants conceded in the Court of Appeals that there were no factual issues that could have a bearing on the constitutionality of these provisions. Consequently, even if a preliminary injunction should have issued, the proper course would have been to remand for final determination of the merits.

Indeed, since *Youngstown Sheet & Tube Co.* was decided this Court has expressly reaffirmed that "a state statute should not be declared unconstitutional by a district court if a preliminary injunction is granted a plaintiff to protect his interests during the ensuing litigation." *Withrow* v. *Larkin*, 421 U. S. 35, 43 (1975). See *Mayo* v. *Lakeland Highlands Canning Co.*, 309 U. S. 310 (1940). If it is improper for a district court to enter such a declaratory judgment when it grants a preliminary injunction, then *a fortiori* it is improper for a court of appeals to do so when the district court has only appraised the likelihood of success on the merits. What happened here is even more extreme: the Court of Appeals, re-

viewing the *denial* of a preliminary injunction, held in the first instance that nothing that could be submitted at a trial on the merits would alter *its* conclusion that "most· of the provisions attacked by appellants are unconstitutional as a matter of law." 737 F. 2d, at 287. Nothing in *Youngstown Sheet & Tube Co.* remotely suggests that it was proper for the Court of Appeals to take this extraordinary step. "*Camenisch* makes clear that a determination of a party's entitlement to a preliminary injunction is a separate issue from the determination of the merits of the party's underlying legal claim, and that a reviewing court should not confuse the two." *Stotts*, 467 U. S., at 603 (BLACKMUN, J., dissenting).

The Court strays even further afield when it invokes *Smith* v. *Vulcan Iron Works* in defense of the Court of Appeals' decision to reach and resolve the merits despite the fact that the District Court had not done so and without giving the parties "the benefit . . . of a full opportunity to present their cases." *Camenisch*, 451 U. S., at 396. The trial court in *Smith*, "upon a bill in equity for the infringement of a patent for an invention . .. . entered an interlocutory decree, *adjudging that the patent was valid and had been infringed*, granting an injunction, and referring the case to a master to take an account of profits and damages." 165 U. S., at 518 (emphasis added). The defendant challenged the trial court's alleged "error in holding that the patent was valid, and that it had been infringed." *Ibid.* The Circuit Court of Appeals reversed the decree, rejecting the plaintiff's contention that it could rule only on "whether an injunction should be awarded." *Ibid.* This Court held that under the plain language of the statute conferring jurisdiction on the Circuit Court of Appeals, an appeal was authorized "from the whole of such interlocutory order or decree, and not from that part of it only which grants or continues an injunction," and consequently the statute conferred "authority to consider and decide the case upon its merits." *Id.*, at 525. The trial court, of course, had already done precisely that, deciding the issue

of liability after the parties had joined issue on the merits, while referring the matter of damages to a master. Reliance on *Smith* in this case is therefore misplaced, for, to repeat, the District Court did not decide—and could not properly have decided—the merits of appellees' constitutional claims when it refused to grant a preliminary injunction.

The Court also seeks comfort in an analogy to the rule that a federal court need not abstain, pending state-court review, from reviewing a constitutional challenge to the validity of a state statute that is not fairly subject to an interpretation that will avoid the constitutional question. *Zwickler* v. *Koota*, 389 U. S. 241, 251, and n. 14 (1967). When a federal district court declines to abstain, however, it does not in so doing decide the merits of the constitutional question even if the parties have not had a full opportunity to air them. The court simply proceeds to decide the case in accordance with the normal procedural requirements that safeguard the parties' rights to be heard. A refusal to abstain therefore infringes neither the principle that final judgment should follow a full opportunity to be heard on the factual and legal merits of the case, nor the principle that "parties shall come to issue in the trial forum vested with authority to determine questions of fact." *Hormel*, 312 U. S., at 556. The same cannot be said of what the Court of Appeals did here.

Whatever the exceptions which would justify a district court in finally resolving an issue on the merits at the preliminary injunction stage, no such exception was applicable here. Nor is this a case in which the court of appeals was justified in resolving an issue not passed on in the district court because proper resolution was beyond any doubt or grave injustice might result from failure to do so. See *Singleton* v. *Wulff*, 428 U. S., at 121. The Court of Appeals not only decided to stand in the shoes of the District Court by ruling on an issue not passed upon below—it ruled on an issue on which, absent extraordinary circumstances, the District Court could not have ruled without "'clear and unambiguous

notice'" that would "'afford the parties a full opportunity to present their respective cases.'" *Camenisch, supra,* at 395. The Court attempts to veil the impropriety of its decision to affirm on the merits despite the procedural posture of this case by implying that the challenged provisions are patently unconstitutional. But this claim too is unsupported in this Court's decisions concerning state regulation of abortion.

The discretionary exception the Court fashions today will also prove vexatious to administer. Parties now face the risk that a final ruling on the merits will be entered against them by a court of appeals when an appeal is taken from the grant or denial of a motion for a preliminary injunction, although the district court made only an initial assessment of the likelihood that the moving party would succeed on the merits. It is predictable that parties will respond by attempting to turn preliminary injunction proceedings into contests over summary judgment or full-scale trials on the merits. That tendency will make the preliminary injunction less useful in serving its intended function of preserving the status quo pending final judgment on the merits, while making litigation more expensive, less reliable, and less fair. If this case did not involve state regulation of abortion, it may be doubted that the Court would entertain, let alone adopt, such a departure from its precedents.

II

In this Court, appellants argue that the judgment of the Court of Appeals should be vacated and the District Court's denial of a preliminary injunction sustained. Appellants have stated that they "intend to present to the District Court a complete factual record which . . . could affect the disposition of this case," and have indicated some of the specific factual propositions they would seek to establish. Brief for Appellants 44–48. At oral argument, counsel for appellants reiterated that, with the exception of the second-physician requirement, "there are additional justifications by way of

facts that we can offer" as to each of the challenged provisions. Tr. of Oral Arg. 13. These assertions alone would justify vacating the judgment of the Court of Appeals insofar as that court did more than direct the entry of a preliminary injunction. In *Singleton* v. *Wulff, supra,* at 120, for example, this Court reversed the Court of Appeals' decision to reach the merits of that case, even though this Court had "no idea what evidence, if any, petitioner would, or could, offer in defense of this statute," because it was clear that "petitioner has had no opportunity to proffer such evidence." I would apply that reasoning here even if I were not persuaded that as to several of the challenged provisions additional factual development—for example, facts concerning the costs associated with the reporting and informed consent provisions, and the extent of the problems Pennsylvania was seeking to correct—could affect the decision on the merits. Appellants should not have to prove that they are entitled to an opportunity to be heard.

Since it rendered "what amounts to a final declaratory judgment on the constitutionality of the statute," *ante,* at 806 (WHITE, J., dissenting), the Court of Appeals necessarily believed that in light of *Akron* and its companion cases appellees had established a sufficient likelihood of success on the merits to warrant issuance of a preliminary injunction. Pennsylvania contends that this ruling is erroneous even under the supervening decisions of this Court. In the alternative, Pennsylvania suggests that the facial constitutionality of the challenged provisions of its Abortion Act may be sustained on this record.

I agree with much of what JUSTICE WHITE has written in Part II of his dissenting opinion, and the arguments he has framed might well suffice to show that the provisions at issue are facially constitutional. Nonetheless, I believe the proper course is to decide this case as the Court of Appeals should have decided it, lest appellees suffer the very prejudice the Court sees fit to inflict on appellants. For me, then, the

question is not one of "success" but of the "likelihood of success." In addition, because Pennsylvania has not asked the Court to reconsider or overrule *Roe* v. *Wade*, 410 U. S. 113 (1973), I do not address that question.

I do, however, remain of the views expressed in my dissent in *Akron*, 462 U. S., at 459–466. The State has compelling interests in ensuring maternal health and in protecting potential human life, and these interests exist "throughout pregnancy." *Id.*, at 461 (O'CONNOR, J., dissenting). Under this Court's fundamental-rights jurisprudence, judicial scrutiny of state regulation of abortion should be limited to whether the state law bears a rational relationship to legitimate purposes such as the advancement of these compelling interests, with heightened scrutiny reserved for instances in which the State has imposed an "undue burden" on the abortion decision. *Id.*, at 461–463 (O'CONNOR, J., dissenting). An undue burden will generally be found "in situations involving absolute obstacles or severe limitations on the abortion decision," not wherever a state regulation "may 'inhibit' abortions to some degree." *Id.*, at 464 (O'CONNOR, J., dissenting). And if a state law does interfere with the abortion decision to an extent that is unduly burdensome, so that it becomes "necessary to apply an exacting standard of review," *id.*, at 467 (O'CONNOR, J., dissenting), the possibility remains that the statute will withstand the stricter scrutiny. See *id.*, at 473–474 (O'CONNOR, J., dissenting); *Ashcroft*, 462 U. S., at 505 (O'CONNOR, J., concurring in judgment in part and dissenting in part).

These principles for evaluating state regulation of abortion were not newly minted in my dissenting opinion in *Akron*. Apart from *Roe*'s outmoded trimester framework, the "unduly burdensome" standard had been articulated and applied with fair consistency by this Court in cases such as *Harris* v. *McRae*, 448 U. S. 297, 314 (1980), *Maher* v. *Roe*, 432 U. S. 464, 473 (1977), *Beal* v. *Doe*, 432 U. S. 438, 446 (1977), and *Bellotti* v. *Baird*, 428 U. S. 132, 147 (1976). In *Akron* and

*Ashcroft* the Court, in my view, distorted and misapplied this standard, see *Akron*, 462 U. S., at 452–453 (O'CONNOR, J., dissenting), but made no clean break with precedent and indeed "follow[ed] this approach" in assessing some of the regulations before it in those cases. *Id.*, at 463 (O'CONNOR, J., dissenting).

The Court today goes well beyond mere distortion of the "unduly burdensome" standard. By holding that each of the challenged provisions is facially unconstitutional as a matter of law, and that no conceivable facts appellants might offer could alter this result, the Court appears to adopt as its new test a *per se* rule under which any regulation touching on abortion must be invalidated if it poses "an unacceptable danger of deterring the exercise of that right." *Ante*, at 767. Under this prophylactic test, it seems that the mere possibility that some women will be less likely to choose to have an abortion by virtue of the presence of a particular state regulation suffices to invalidate it. Simultaneously, the Court strains to discover "the anti-abortion character of the statute," *ante*, at 764, and, as JUSTICE WHITE points out, invents an unprecedented canon of construction under which "in cases involving abortion, a permissible reading of a statute is to be avoided at all costs." *Ante*, at 812 (dissenting). I shall not belabor the dangerous extravagance of this dual approach, because I hope it represents merely a temporary aberration rather than a portent of lasting change in settled principles of constitutional law. Suffice it to say that I dispute not only the wisdom but also the legitimacy of the Court's attempt to discredit and pre-empt state abortion regulation regardless of the interests it serves and the impact it has.

Under the "unduly burdensome" test, the District Judge's conclusion that appellees were not entitled to a preliminary injunction was clearly correct. Indeed, the District Judge applied essentially that test, after suggesting that no "meaningful distinction can be made between the plaintiffs' 'legally

significant burden' and defendants' 'undue burden.'" 552 F. Supp., at 796. I begin, as does the Court, with the Act's informed consent provisions.

The Court condemns some specific features of the informed consent provisions of § 3205, and issues a blanket condemnation of the provisions in their entirety as irrelevant or distressing in some cases and as intruding on the relationship between the woman and her physician. JUSTICE WHITE convincingly argues that none of the Court's general criticisms is appropriate, since the information is clearly relevant in many cases and is calculated to inform rather than intimidate, and since all informed consent requirements must, from the very rationale for their existence, intrude to some extent on the physician's discretion to be the sole judge of what his or her patient needs to know. The "parade of horribles" the Court invalidated in Akron, supra, at 445, is missing here. For example, § 3205(a)(iii) requires that the woman be informed, "when medically accurate," of the risks associated with a particular abortion procedure, and § 3205(a)(v) requires the physician to inform the woman of "[t]he medical risks associated with carrying her child to term." This is the kind of balanced information I would have thought all could agree is relevant to a woman's informed consent.

I do not dismiss the possibility that requiring the physician or counselor to read aloud the State's printed materials if the woman wishes access to them but cannot read raises First Amendment concerns. Even the requirement that women who can read be informed of the availability of those materials, and furnished with them on request, may create some possibility that the physician or counselor is being required to "communicate [the State's] ideology." Akron, supra, at 472, n. 16 (O'CONNOR, J., dissenting); see Wooley v. Maynard, 430 U. S. 705 (1977). Since the Court of Appeals did not reach appellees' First Amendment claim, and since appellees do not raise it here, I need not decide whether this potential problem would be sufficiently serious to warrant issuance of a

preliminary injunction as to those portions of § 3205 that incorporate the printed information provisions of § 3208. I note, however, that this is one of many points on which fuller factual development, including the actual contents of the printed materials, could affect resolution of the merits.

The Court singles out for specific criticism the required description, in the printed materials, of fetal characteristics at 2-week intervals. These materials, of course, will be shown to the woman only if she chooses to inspect them. If the materials were sufficiently inflammatory and inaccurate the fact that the woman must ask to see them would not necessarily preclude finding an undue burden, but there is no indication that this is true of the description of fetal characteristics the statute contemplates. Accordingly, I think it unlikely that appellees could succeed in making the threshold showing of an undue burden on this point, and the information is certainly rationally related to the State's interests in ensuring informed consent and in protecting potential human life. Similarly, I see little chance that appellees can establish that the abortion decision is unduly burdened by § 3205's requirements that the woman be informed of the availability of medical assistance benefits and of the father's legal responsibility. Here again, the information is indisputably relevant in many cases and would not appear to place a severe limitation on the abortion decision.

The Court's rationale for striking down the reporting requirements of § 3214, as JUSTICE WHITE shows, rests on an unsupported finding of fact by this Court to the effect that "[i]dentification is the obvious purpose of these extreme reporting requirements." *Ante,* at 767 (opinion of the Court). The Court's "finding," which is contrary to the preliminary finding of the District Judge that the statute's confidentiality requirements protected against any invasion of privacy that could burden the abortion decision, see 552 F. Supp., at 804, is simply another consequence of the Court's determination to prevent the parties from developing the facts. I do not

know whether JUSTICE WHITE is correct in stating that "the provisions pose little or no threat to the woman's privacy," *ante,* at 807 (dissenting), and I would leave that determination for the District Court, which can hear evidence on this point before making its findings. I do not, however, see a substantial threat of identification on the face of the statute, which does not require disclosure of the woman's identity to anyone, and which provides that reports shall be disclosed to the public only in "a form which will not lead to the disclosure of the identity of any person filing a report." § 3214(e)(2). I therefore conclude that the District Judge correctly ruled that appellees are unlikely to succeed in establishing an undue burden on the abortion decision stemming from the possibility of identification.

I fully agree with JUSTICE WHITE that the Court has misconstrued the intended meaning of § 3210(b)'s requirement that physicians employ the abortion method that is most likely to save the fetus unless, in the physician's good-faith judgment, that method "would present a significantly greater risk to the life or health of the pregnant woman." Since § 3210(b) can fairly be read to require "only that the risk be a real and identifiable one," *ante,* at 807 (WHITE, J., dissenting), there is little possibility that a woman's abortion decision will be unduly burdened by risks falling below that threshold. Accordingly, § 3210(b) should not be preliminarily enjoined, and I express no opinion as to the point at which a "trade-off" between the health of the woman and the survival of the fetus would rise to the level of an undue burden.

Since appellants and appellees agree that no further fact-finding is needed concerning appellees' challenge to § 3210(c)'s second-physician requirement, I am willing to assume that the merits of that challenge are properly before us. I have nothing to add to JUSTICE WHITE'S demonstration that this provision is constitutional under *Ashcroft* because the Act effectively provides for an exception making this requirement inapplicable in emergency situations. I likewise agree

with JUSTICE WHITE that the preliminary injunction entered against enforcement of the Act's parental notice and consent provisions should be vacated, since, as in *Ashcroft*, there is no reason here to believe that the State will not provide for the expedited procedures called for by its statute. See *Ashcroft*, 462 U. S., at 491, n. 16 (opinion of POWELL, J.). I add only that the Court's explanation for its refusal to follow *Ashcroft*—that the new rules "should be considered by the District Court in the first instance," *ante*, at 758, n. 9— does not square with its insistence on resolving the rest of this case without giving the District Court an opportunity to do so.

In my view, today's decision makes bad constitutional law and bad procedural law. The "'undesired and uncomfortable straitjacket'" in this case, *ante*, at 762, is not the one the Court purports to discover in Pennsylvania's statute; it is the one the Court has tailored for the 50 States. I respectfully dissent.